# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 24, 2025           Decided April 17, 2026

No. 22-1071

SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION,
PETITIONER

v.

KC TRANSPORT, INC. AND FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,
RESPONDENTS

———

On Remand from the Supreme Court of the United States

———

*Susannah M. Maltz*, Attorney, U.S. Department of Labor, argued the cause for petitioner. With her on the briefs were *Emily Toler Scott*, Counsel for Appellate Litigation, and *Michael S. Raab* and *Sean R. Janda*, Attorneys.

*Harold Craig Becker* was on the brief for *amicus curiae* American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) in support of petitioner.

*James P. McHugh* and *Aditya Dynar* argued the causes for respondents. With them on the briefs were *Christopher D. Pence* and *Damien M. Schiff*. *Thaddeus J. Riley* entered an appearance.

*Thomas Berry* and *Ilya Shapiro* were on the brief for *amici curiae* Manhattan Institute and Cato Institute in support of respondents.

*J. Marc Wheat* was on the brief for *amici curiae* Advancing American Freedom, et al. in support of respondents.

*John B. McCuskey*, Attorney General, Office of the Attorney General for the State of West Virginia, *Michael R. Williams*, Solicitor General, *Treg Taylor*, Attorney General, Office of the Attorney General for the State of Alaska, *Steve Marshall*, Attorney General, Office of the Attorney General for the State of Alabama, *Tim Griffin*, Attorney General, Office of the Attorney General for the State of Arkansas, *James Uthmeier*, Attorney General, Office of the Attorney General for the State of Florida, *Chris Carr*, Attorney General, Office of the Attorney General for the State of Georgia, *Raul Labrador*, Attorney General, Office of the Attorney General for the State of Idaho, *Theodore E. Rokita*, Attorney General, Office of the Attorney General for the State of Indiana, *Brenna Bird*, Attorney General, Office of the Attorney General for the State of Iowa, *Liz Murrill*, Attorney General, Office of the Attorney General for the State of Louisiana, *Lynn Fitch*, Attorney General, Office of the Attorney General for the State of Mississippi, *Andrew Bailey*, Attorney General, Office of the Attorney General for the State of Missouri, *Michael T. Hilgers*, Attorney General, Office of the Attorney General for the State of Nebraska, *Drew Wrigley*, Attorney General, Office of the Attorney General for the State of North Dakota, *Dave Yost*, Attorney General, Office of the Attorney General for the State of Ohio, *Gentner Drummond*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *Marty Jackley*, Attorney General, Office of

the Attorney General for the State of South Dakota, *Jonathan Skrmetti*, Attorney General and Reporter, Office of the Attorney General for the State of Tennessee, and *Ken Paxton*, Attorney General, Office of the Attorney General for the State of Texas, were on the brief for *amici curiae* State of West Virginia and 19 Other States in support of respondents.

Before:  WILKINS, WALKER, and PAN, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* WILKINS.

Concurring Opinion filed by *Circuit Judge* PAN.

Dissenting Opinion filed by *Circuit Judge* WALKER.

WILKINS, *Circuit Judge*:  Congress affirmed the importance of regulating effective health and safety standards within the mining industry when it enacted the Federal Mine Safety and Health Amendments Act of 1977 ("Mine Act"), Pub. L. No. 95-164, 91 Stat. 1290 (codified as amended at 30 U.S.C. §§ 801–966).  The Mine Act reaches every "coal or other mine" (hereinafter, "mine"), which the statute defines as coal extraction sites; the roads appurtenant to those sites; and the places, "facilities," and things "used in, or to be used in, or resulting from," mining activity.  30 U.S.C. § 802(h)(1).  This dispute concerns how broadly we construe the last category.

KC Transport is an independent trucking company that provides various hauling services for mining and other companies.  When the events at issue occurred, KC Transport operated a maintenance facility for its haul trucks about a mile from one of its client's active mines.  A Mine Safety and Health Administration ("MSHA") inspector visited the facility, after having inspected a nearby mine, and observed two of KC

Transport's trucks undergoing maintenance. Both trucks were raised and unblocked from motion, and one truck had a person standing underneath it. Because the trucks' conditions violated federal safety standards, the MSHA inspector cited KC Transport.

In an administrative proceeding, KC Transport contested the citations, arguing that MSHA had no jurisdiction over its maintenance facility or the trucks parked there. An administrative law judge ("ALJ") held that MSHA had jurisdiction because KC Transport's facility is a mine and the trucks, at least while parked at the facility, are equipment "used in" mining-related activity and thus are "mine[s]" under the Mine Act. KC Transport appealed to the Federal Mine Safety and Health Review Commission ("Commission"), which held that no facility or truck used in mining is a "mine" under the Mine Act unless it is located at an extraction site or a road appurtenant thereto. Because neither the cited trucks nor the facility where they were parked were located on land where mineral extraction occurs or on roads appurtenant to such land, the Commission held that none constituted a "mine" and vacated the citations.

The Secretary of Labor ("Secretary"), acting through MSHA, petitioned our Court for review of the Commission's decision. *See* 30 U.S.C. § 816(b). The Secretary submits that KC Transport's facility and trucks are mines because they were "used in" mining activity. *See id.* § 802(h)(1)(C); Pet. Br. 42–44.[1]

---

[1] KC Transport also argued before the Commission that it was not an "operator" under the Mine Act. In 2023, we held that the Commission lacked jurisdiction to consider that question, which KC Transport had not pressed before the ALJ. *Sec'y of Lab. v. KC*

In an opinion issued in 2023, we held that the term "mine" under the Mine Act was ambiguous and recognized that such ambiguity generally would warrant deference to the Secretary's reasonable interpretation under *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). *Sec'y of Lab. v. KC Transp., Inc.*, 77 F.4th 1022, 1025, 1028 (D.C. Cir. 2023). But because the Secretary's position failed to grapple with several textual clues undermining her position, we vacated and remanded the Commission's decision, permitting the Secretary an opportunity to interpret the statute's ambiguous text. *Id.* at 1025, 1028–33.

KC Transport sought Supreme Court review. Petition for Writ of Certiorari, *KC Transp., Inc. v. Su*, 144 S. Ct. 2708 (2024) (mem.) (No. 23-876), 2024 WL 645391. Shortly after, the Supreme Court overruled *Chevron*. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 411–12 (2024). The Supreme Court then granted KC Transport's petition, vacated our judgment, and remanded the case for further consideration in light of *Loper Bright*. *KC Transp., Inc.*, 144 S. Ct. at 2708.

We now reconsider the Secretary's petition in accordance with the mandate to "exercise [our] independent judgment," employing "the traditional tools of statutory construction . . . to resolve statutory ambiguities" and determine "whether an agency has acted within its statutory authority." *Loper Bright*, 603 U.S. at 401, 412. Reviewing the statute *de novo* and

---

*Transp., Inc.*, 77 F.4th 1022, 1025, 1033–34 (D.C. Cir. 2023). When KC Transport petitioned for certiorari, it did not raise this issue. *See generally* Petition for Writ of Certiorari at i., *KC Transp.*, *Inc. v. Su*, 144 S. Ct. 2708 (2024) (mem.) (No. 23-876), 2024 WL 645391, at *i. Accordingly, whether KC Transport is an operator is not before us on remand.

without deference, we conclude that KC Transport's facility is a mine within the meaning of the Mine Act.

**I.**

**A.**

The Mine Act provides for mandatory health and safety standards that govern the mining of coal, metals, and non-metals.[2] *See Sec'y of Lab. v. Excel Mining, LLC*, 334 F.3d 1, 3 (D.C. Cir. 2003) (discussing 30 U.S.C. § 961(a)). In it, Congress affirmed that "the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource—the miner." 30 U.S.C. § 801(a). Congress also aimed "to provide more effective means and measures for improving the working conditions" in American mines and "to prevent death[,] . . . serious physical harm, and . . . occupational diseases." *Id.* § 801(c).

Under the Mine Act's regulatory scheme, the Secretary "develop[s]" and "promulgate[s] . . . improved mandatory health or safety standards for the protection of life" in mines. *Id.* § 811(a). MSHA enforces these standards by conducting regular inspections and issuing citations for any discovered violations. *See id.* §§ 813(a), 813(g), 813(k), 815(a). Violations are subject to civil penalties that the Secretary is authorized to assess and assign. *Id.* § 820(a).

---

[2] For a brief history of the catastrophic injuries and fatalities that prompted federal regulation of mine safety, see Patrick C. McGinley, *With a Wink and a Nod: How Politicians, Regulators, and Corrupt Coal Companies Exploited Appalachia*, 57 U. Rich. L. Rev. 899, 905–08 (2023).

The Commission "is an independent agency charged with adjudicating disputes under the Mine Act." *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 152 (D.C. Cir. 2006); 30 U.S.C. §§ 815, 823. It is a multi-member body[3] "appointed by the President by and with the advice and consent of the Senate." 30 U.S.C. § 823(a). The Commissioners serve staggered six-year terms and are removable only for "inefficiency, neglect of duty, or malfeasance." *Id.* § 823(b). The Commission may appoint ALJs to hear disputes arising under the Mine Act in the first instance. *See id.* § 823(d)(1). Anyone aggrieved by an ALJ's decision may seek the Commission's discretionary review, *id.* § 823(d)(2)(A)(i), and any person aggrieved by an order of the Commission may obtain review in this Court, *id.* § 816(a)(1). The Secretary is also authorized to seek review or enforcement of any final order of the Commission in this Court. *Id.* § 816(b).

Whether a facility is subject to the Mine Act's obligations depends upon whether the facility constitutes a "mine." Under the Mine Act, a "mine" is defined as:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including

---

[3] By statute, the Commission "shall consist of five members." 30 U.S.C. § 823(a). But Congress provided that it may delegate all of its powers to a group of "three or more" Commissioners. *Id.* § 823(c). At the time this dispute was before the Commission, there were three Commissioners.

impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

*Id.* § 802(h)(1). In short, the statute's jurisdiction over "mine[s]" covers: (1) extraction sites; (2) the "private ways and roads appurtenant" thereto; and (3) a list of items and places, *including "facilities,"* that are "used in," "to be used in," or "resulting from" mining-related activity. *Id.* (emphasis added).

**B.**

The material facts are undisputed. *See* J.A. 4–13 (Joint Stipulations). KC Transport is an independent trucking company that provides hauling services to various businesses for different materials (*e.g.*, coal, earth, and gravel) and operates truck maintenance and storage facilities. The at-issue events took place at KC Transport's facility located in Emmett, West Virginia.

One of KC Transport's clients is a coal mine operator known as Ramaco Resources ("Ramaco"), which maintains five mines near the Emmett facility. Ramaco's representatives informed KC Transport that it could use the facility for maintenance, as Ramaco had no plans to operate a coal mine there. Thereafter, KC Transport began using the facility as its "maintenance area/shop." J.A. 7.

At the time in question, the facility included only a parking area and two maintenance shipping containers. The facility was a "convenient centralized maintenance facility . . . for KC Transport," J.A. 7, and KC Transport used it to operate about 35 trucks. Ramaco's coal processing plant—the Elk Creek Preparation Plant—is about one mile away; its deep mines are about four to five miles away; and its strip mines are about six miles away. An estimated "60% of the [facility's] services" supported Ramaco's five nearby mines, and the remaining 40% of services aided other companies, like "American Electric Power . . . and other coal operators." *Id.* The types of trucks at the facility were a mix of (1) off-road trucks, providing haulage for Ramaco's five nearby mines; and (2) on-road trucks used in earth, coal, and gravel haulage for non-Ramaco customers.

The only way to access the facility is by entering through a gate on Right Hand Fork Road, which is located just off the haulage road that runs past Elk Creek Plant and dead ends on the other side of the facility. The facility is about 1,000 feet from the haulage road, and while the road leading "into the KC Transport facility is not a coal haulage road[,] [it] does branch off from a haulage road." J.A. 6. While part of the haulage road is public, everything past the gate is reserved for authorized persons. On the day the trucks were cited, the gate was open because it was broken.

On March 11, 2019, an MSHA coal mine inspector visited Ramaco's nearby Elk Creek Plant.[4] Upon completing the Elk Creek Plant inspection, the inspector went "looking for trucks" that MSHA had previously cited, with the intent to terminate

---

[4] Although MSHA had never inspected or attempted to inspect KC Transport's trucks at the facility, MSHA regularly inspected KC Transport's trucks at the Elk Creek Plant and along the haulage road.

those citations. J.A. 5; *see* 30 U.S.C. § 814(e)(3). The inspector traveled over a mile along the haulage road, turned onto Right Hand Fork Road, continued for about 1,000 feet, and reached the facility.

Upon arriving, the inspector observed KC Transport's trucks undergoing maintenance. According to MSHA safety regulations, "[r]epairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where machinery motion is necessary to make adjustments." 30 C.F.R. § 77.404(c) (2019). Two of KC Transport's trucks, however, were unblocked. Notably, because these particular trucks "were not licensed to haul products over public roads," they were "only being operated on private land," J.A. 10, and were "regularly used to haul coal from the five Ramaco mines to the Elk Creek prep plant," J.A. 8. At the time of inspection, the first truck was "jacked up with the wheels and tires off both back axles," and "[w]ork [was] being preformed [sic] on the brakes located on the back axles of the truck." J.A. 53. The second truck was raised and a miner was underneath it, "standing on the frame of the truck." J.A. 55; *see also* J.A. 58. Because neither of the two trucks were "blocked against motion," the inspector found KC Transport in violation of 30 C.F.R. § 77.404(c), and issued Citations Nos. 9222038 and 9222040.

## C.

KC Transport contested the two citations, and both the Secretary and KC Transport filed cross-motions, requesting summary decision. The ALJ rejected the parties' interpretations of subsection (C) but ultimately ruled in the Secretary's favor, upholding the two citations as a proper exercise of the Mine Act's jurisdiction. In the ALJ's view, the

facility and the mining-related equipment (here, the trucks) located therein were too connected to the mining process to be excluded from the Mine Act's jurisdiction. Thus, the ALJ held that the facility constituted a "mine" under subsection (C)'s plain meaning, "and because the trucks were used in mining and parked at the facility," they qualified as "equipment" under subsection (C). J.A. 84.

On appeal, a divided Commission reversed the ALJ's finding of jurisdiction and vacated the two contested citations. According to the majority, 30 U.S.C. § 802(h)(1) unambiguously limits the "mine" definition to extraction sites and lands appurtenant thereto. Thus, the Commission held "that an independent repair, maintenance, or parking facility not located on or appurtenant to a mine site and not engaged in any extraction, milling, preparation, or other activities within the scope of subsection 3(h)(1)(A) is not a mine within the meaning of section 3(h) of the Mine Act." J.A. 168. One commissioner dissented, taking an even broader view than the ALJ, and argued that regardless of the facility, the trucks constituted mines as they were "used in" mining and are "essential and integral" to that process. J.A. 176. The Secretary petitioned for review of the Commission's decision. 30 U.S.C. § 816(b).

## II.

This case turns on whether the facility or the trucks constituted a "mine" under 30 U.S.C. § 802(h)(1)(C) of the Mine Act, such that MSHA had jurisdiction to cite KC Transport for violating safety regulation 30 C.F.R. § 77.404(c). If the Mine Act applies, the parties agree both citations should be upheld and KC Transport owes a penalty fee of $3,908 regarding citation No. 9222038, and $4,343 regarding citation

No. 9222040. J.A. 12–13. Because we hold that the facility is a mine, we do not reach whether the trucks were also independently jurisdictional "mines" at the time they were cited.

## A.

Before reaching the merits, we address the threshold issue of justiciability.

KC Transport argues that resolving this dispute "necessitate[s] a course of action that violates the Vesting, Take Care, and Opinion Clauses of Article II." Resps. Third Suppl. Br. 10. We construe KC Transport's attack based on Article II as a structural constitutional objection seeking to preserve the separation of powers between the three branches. *See Freytag v. Comm'r*, 501 U.S. 868, 878–79 (1991) (resolving an Appointments Clause challenge). These types of challenges are "nonjurisdictional" and "thus not subject to the axiom that jurisdiction may not be waived." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 756 (D.C. Cir. 2009) (citations omitted). Indeed, the Secretary agrees that KC Transport's Article II attack—raised nearly three years after it filed its opening brief—is non-jurisdictional and forfeited. Pet. Supp. Br. 2, 11. Had this Court not invited briefing on the Article II issue through its own motion, we would likely agree. But given that KC Transport raised this dilatory argument at our request, we exercise our discretion to resolve it. *See Freytag*, 501 U.S. at 878–79.

## 1.

As a practical matter, calling this petition an intra-Executive dispute is more theoretical than real. The Secretary named KC Transport as the lead respondent, and KC Transport

has been the only real litigant participating in the proceeding as an adversary to the Secretary.  Granted, the Secretary also listed the Commission as a respondent as ostensibly required by Federal Rule of Appellate Procedure 15 ("Rule 15"), *see* Fed. R. App. P. 15(a)(2)(B), but after the Secretary filed his opening brief in our Court, the Commission notified us that "[p]ursuant to the Commission's discretionary policy in appellate court proceedings involving review of its decisions, the Commission will not be participating as an active litigant in the proceeding." Commission Letter, Dkt. No. 1963198 (Sept. 12, 2022).  Rather than litigate, the Commission announced that it "will stand on the decision it issued in its adjudicative capacity." *Id*.  In sum, the Commission bowed out of this dispute even before seeing KC Transport's brief in opposition to the Secretary, and we have not heard from it since in any substantive capacity.  Thus, this is an intra-Executive dispute in name only.  The real adversaries litigating this petition are the Secretary and KC Transport.

One would think that if our resolution of this dispute truly intrudes upon the prerogatives of the "unitary Executive," then the Executive would say so.  But the Commission has said nothing at all, and the Secretary denies that there is any constitutional problem whatsoever.  According to the Secretary, "[i]n all relevant constitutional respects, this proceeding is an ordinary civil enforcement action between the Secretary and a regulated entity.  Such an enforcement action does not implicate Article III's jurisdictional limits or Article II's provision of authority to the President."  Pet. Supp. Br. 1.

To put a finer point on the matter, the present statutory scheme does not undermine the unitary Executive because it does not prevent the President from resolving the alleged intra-branch dispute if he so desired.  As explained by the Secretary,

> [O]n the merits, the critical point for Article II purposes is that the President must have the option of resolving disputes among his subordinates. He is not required, however, to exercise that authority in every circumstance, and, when he chooses not to resolve a particular dispute, his subordinates may act according to their own independent authorities. Congress's choice to permit the Secretary to seek judicial review in such a circumstance does not offend Article II, because that option does not effectively preclude the President from exercising his supervisory authority if he so chooses.
>
> * * *
>
> The Secretary's option of seeking judicial review does not preclude the President from exercising his supervisory authority; for example, if the President agreed with the Commission's understanding of the Secretary's jurisdiction, he could have directed the Secretary not to pursue judicial review. But in the face of the President's choice not to review the dispute, the Secretary's availing herself of the statutory right to seek judicial review does not violate Article II.

Pet. Supp. Br. 2–3, 13.

One might say that "[c]onsequently, the specific legal issue the [dissent] chooses to address is, at this time, nothing more than a tempest in a teapot." *See Nat'l Cable &*

15

*Telecommunications Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 348 (2002) (Thomas, J., dissenting).

As the Supreme Court has observed, "[t]he mere assertion of a claim of an 'intra-branch dispute,' without more, has never operated to defeat federal jurisdiction; justiciability does not depend on such a surface inquiry." *United States v. Nixon*, 418 U.S. 683, 693 (1974). Looking beyond the surface, we see that enforcement of the Mine Act is the sole duty of the Secretary, so the Secretary is the party that is actually adverse to the mine company. The adjudicatory Commission simply does not have a stake in the dispute. *See Cuyahoga Valley Ry. Co. v. United Transp. Union*, 474 U.S. 3, 7 (1985) ("The [analogous Occupational Safety and Health Review] Commission's function is to act as a neutral arbiter and determine whether the Secretary's citations should be enforced over employee or union objections."). Without true adversity between the Secretary and the Commission, the justiciability challenge is without merit. Article III of the Constitution implicates only "actual controversies arising between adverse litigants," and "no case or controversy exists" between a litigant and the judges (here, the commissioners) adjudicating the dispute. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39–40 (2021) (citation modified); *see also id.* at 40–41 (noting that all members of the Court agree that state court judges are not proper parties to a challenge to a state law). We therefore hold that the Commission's role in this litigation as merely a nominal respondent does not create a case or controversy sufficient to implicate Article III justiciability concerns.

**2.**

Even if we are incorrect that the Commission's role as a nominal respondent is sufficient to foreclose the justiciability

challenge, we alternatively hold that the separation of powers objection is strongly rebutted by our constitutional history and our precedent. Indeed, several actions taken by the First, Second, Third, and Fourth Congresses powerfully refute it.

One of the first laws enacted by the First Congress was the Collection Act. In it, the First Congress authorized the Comptroller of the Treasury to sue customs surveyors for the amount of their bond "upon any breach" of the condition of "faithful discharge" of their duties. An Act to Regulate the Collection of the Duties, ch. 5, § 28, 1 Stat. 29, 44 (1789). The First Congress expanded this provision the next year, by authorizing the Comptroller to "put in suit" the performance bonds of customs collectors, naval officers, and surveyors who breach their duties. An Act to Provide More Effectually for the Collection of the Duties, ch. 35, § 52, 1 Stat. 145, 171 (1790). When adjudicating cases over payments of these performance bonds, Executive officers ended up on both sides of disputes. *See*, *e.g.*, *Sthreshley v. United States*, 8 U.S. 169, 169 (1807) (describing "an action of debt, brought by the United States in the district court of Kentucky district for the penalty of an official bond given by Sthreshley, with Obannon as his surety"); *United States v. Giles*, 13 U.S. 212, 213 (1815) ("It was an action of debt brought by the United States against Giles, late marshal of the district of New York, and his sureties, upon his official bond . . . ."). The Supreme Court never questioned the justiciability of these early intra-Executive bond lawsuits authorized by the First Congress.

Continuing the trend, the Second Congress authorized additional intra-Executive lawsuits. When establishing the Post Office, the Second Congress provided that if deputy postmasters or others failed to render their accounts, "it shall be the duty of the Postmaster General, to cause a suit to be

commenced against the person or persons so neglecting or refusing." An Act to Establish the Post-Office and Post Roads Within the United States, ch. 7, § 24, 1 Stat. 232, 238–39 (1792).

The trend continued in the Third Congress. When it passed more extensive legislation expanding and regulating the Post Office, the Third Congress retained the provision requiring the Postmaster General to sue deputy postmasters and other officials who failed to render their documentation in a timely fashion. *See* An Act to Establish the Post-Office and Post-Roads Within the United States, ch. 23, § 24, 1 Stat. 354, 364–65 (1794). In similar fashion, the Third Congress enacted legislation authorizing the Comptroller of the Treasury, "at [his] discretion," to sue "any person who has received monies for which he is accountable to the United States" and fails to render account statements and vouchers in a timely manner. An Act for the More Effectual Recovery of Debts Due from Individuals to the United States, ch. 48, §1, 1 Stat. 441, 441 (1795).

Similarly, the Fourth Congress provided that if revenue officers failed to remit receipts, "it shall be the duty of the comptroller, and he is hereby required to institute suit for the recovery of the same." An Act to Provide More Effectually for the Settlement of Accounts Between the United States, and Receivers of Public Money, ch. 20, § 1, 1 Stat. 512, 512 (1797).

None of these early statutes distinguished between current and former executive officials in their text—either were subject to suit. *Contra* Dissenting Op. 25–27 (suggesting that these early statutes only applied to former officials). In *Walton v. United States*, 22 U.S. 651, 655 (1824), the Court described the Comptroller of the Treasury legislation as providing for "an

impartial trial. . . [,] and if the Court and jury, before whom the cause is tried, should be of the opinion that any item of [the revenue officer's] account has been improperly rejected, it is restored to his credit." In other words, the Third Congress provided that a court and a jury, rather than the President, should settle the disagreements between a receiver of public monies and the Auditor and Comptroller. Similarly, in *Postmaster General of the U.S. v. Early*, 25 U.S. 136 (1827), the reporter described the lawsuit brought under the Postmaster legislation as an action "in the name of the Post Master General of the United States," and when referring to the lead defendant, it said "Eleazer Early . . . *is* Post Master at Savannah." 25 U.S. at 136 (emphasis added).

*Postmaster General v. Early* is significant for another reason: the Court rejected an Article III jurisdictional challenge to the statute. Mr. Early challenged the jurisdiction of the Court, arguing that Article III, Section 2 applied to "controversies to which The United States is a party," while the statute required the lawsuit to be brought in the name of the Postmaster General, rather than in the name of the United States. 25 U.S. at 137–39. Writing for the Court, Chief Justice Marshall rejected the argument, explaining that even though the suit was brought in the name of the Postmaster General, the United States was the real party in interest. *Id*. at 146. The Court noted that prior versions of the statute specified that these lawsuits were to be brought in the name of the United States, and that the 1810 amendment directing the naming of the Postmaster General should not be construed as an intent to "relinquis[h]" the jurisdiction of the federal courts. *Id*. As the Court put it, "[t]hat construction[,] which will produce a consequence so directly opposite to the whole spirit of our legislation, ought to be avoided, if it can be avoided without a total disregard of those rules by which Courts of justice must

be governed." *Id*. Thus, just as we held above, the Court rejected an Article III challenge based on the identity of the nominal party by identifying the real party in interest. *See supra* at 14. Even more importantly, the Court held that the jurisdiction of a lawsuit by the Postmaster General against another Executive official "is unquestionable." *Id*. at 147.

The actions of these early Congresses are compelling authority that intra-Executive suits authorized by Congress do not contradict the Framers' understanding of the separation of powers. As the Supreme Court has explained,"[w]hat is . . . decisive as to th[e] intent in the Constitution is the action on it by the second Congress, only a few years after, and of which some were members who aided in framing the Constitution itself." *Luther v. Borden*, 48 U.S. 1, 73 (1849); *see also Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884) ("The construction placed upon the constitution by the first act of 1790 and the act of 1802, by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight . . . ."); *United States v. Watson*, 423 U.S. 411, 420 (1976) (using acts of the Second Congress to interpret the scope of the Fourth Amendment).

The dissent relies upon some early correspondence written by then-Chief Justice John Jay and then-Attorney General Edmund Randolph to argue that intra-Executive lawsuits are unconstitutional because a President cannot "delegate his decisions to the federal Judiciary." *See* Dissenting Op. 13–16. However, we respectfully submit that the force of the dissent's citations pale in comparison to the authoritative heft of the multiple pieces of *actual legislation* referenced above, passed by both chambers of the early Congresses, signed into law by

George Washington and John Adams,[5] and construed favorably by the Supreme Court.

In addition to the actions of these early Congresses, we have helpful precedent from the Supreme Court regarding more modern-era statutes. Significantly, the Court has held that a suit by the United States against the Interstate Commerce Commission and intervenor railroads was justiciable. *See United States v. ICC*, 337 U.S. 426, 430–31 (1949). Our dissenting colleague claims that *ICC* is off point because the Secretary was merely in the position of a regulated party. Dissenting Op. 19–21. While this characterization of the Secretary's role is accurate, it is not dispositive of the question before us. After all, the intra-Executive lawsuits authorized by the early Congresses did not involve Executive officials occupying the same role as regulated parties.

Furthermore, while the Cabinet Secretary was a regulated party in *ICC*, the Court later found justiciability in a dispute between a Cabinet Secretary and a commission acting in an adjudicatory capacity, where the Secretary's interest was not as a regulated party, but as a party with a special interest— recognized by Congress—in ensuring the proper interpretation and implementation of a statute. *See Udall v. Fed. Power Comm'n*, 387 U.S. 428, 439–40 (1967). *Udall* originated in our Court due, in part, to a petition filed by the Secretary of the Interior for review of orders of the Federal Power Commission. *See Washington Pub. Power Supply Sys. v. Fed. Power Comm'n*, 358 F.2d 840, 848 (D.C. Cir. 1966), *rev'd and remanded sub nom. Udall v. Fed. Power Comm'n*, 387 U.S. 428

---

[5] *See generally*, Christine Kexel Chabot, *Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129, 133 (2022) (analyzing the unitary executive theory "[b]y scouring every public act passed by the First Congress").

(1967). Our Court denied the Secretary's petition. When reversing our Court and granting the Secretary's petition, the Supreme Court explained that "the Secretary . . . comes to the Federal Power Commission with a special mandate from Congress, a mandate that gives him special standing to appear, to intervene, to introduce evidence on the proposed river development program, and to participate fully in the administrative proceedings." *Udall v. Fed. Power Comm'n*, 387 U.S. at 439–40.

In sum, while the Court has cautioned that it would be "inappropriate" to "put the federal courts into the regular business of deciding intrabranch and intraagency policy disputes," *Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995), the Court has nonetheless recognized that Congress possesses the authority to designate an agency official as a "party aggrieved" that has standing to challenge the action of another Executive official, *id*. at 127–30. Thus, "*without benefit of specific authorization to appeal*, an agency, in its regulatory or policy-making capacity" will *not* generally be considered to be a party "'adversely affected' or 'aggrieved'" with standing to sue under the Administrative Procedure Act or other statutory review provisions. *Id*. at 127 (emphasis added). Thus, in *Newport News*, the Court held that the Director of the Office of Worker's Compensation Programs did not have standing to appeal a decision of the Labor Department's Benefit Review Board because the judicial review provision, 33 U.S.C. § 921(c), was "silen[t]" regarding the Director's authorization to appeal, and thus did not confer standing. *Id*. at 129–30. However, in doing so, the Court distinguished 29 U.S.C. § 660(b), which expressly grants the Secretary of Labor authority to seek review of orders by the Occupational Safety and Health Review Commission, an adjudicatory body, and the

Court held up that statute as an example of Congress designating an agency official as a "party aggrieved" in a statute. *Id*. at 130.

Indeed, the Court in *Newport News* went so far as to state that "Congress *could* have conferred standing upon the Director without infringing Article III of the Constitution"—it just did not do so. *Id*. at 133 (emphasis in original). In other words, the Court explained that Congress can confer standing upon an Executive official to sue another Executive official pursuant to its authority to prescribe the "judicial Power" of the inferior courts, U.S. Const. art. III, § 1, and "the judicial Power . . . extend[s] to all Cases . . . arising under . . . the Laws of the United States . . . [and] to Controversies to which the United States shall be a Party," *id.* § 2.

Two years later, the Court adopted the reasoning of *Newport News* in a jurisdictional holding in *Ingalls Shipbuilding, Inc. v. Dir., Off. of Workers' Comp. Programs*, 519 U.S. 248 (1997). In that case, Ingalls filed a petition for review of a decision by the Benefits Review Board, in which the Board ruled that the widow of a shipfitter was entitled to death benefits under the Longshore and Harbor Workers' Compensation Act. *See generally* 33 U.S.C. § 901, *et seq*. After the Director of the Office of Workers' Compensation Programs ("Director") appeared and filed a brief defending the award, Ingalls moved to strike the brief, arguing that the Director did not have an interest in the dispute and therefore lacked standing. *See Ingalls Shipbuilding, Inc. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 65 F.3d 460, 463 n.2 (5th Cir. 1995), *aff'd sub nom. Ingalls Shipbuilding, Inc. v. Dir., Off. of Workers' Comp. Programs, Dep't of Lab.*, 519 U.S. 248, (1997). The court of appeals rejected the challenge. *Id*. Ingalls renewed the standing argument in the

Supreme Court, where the Court also rejected it. As the Court explained, "[w]here there is already a case or controversy between parties properly before a court, as there is in this case between Ingalls and Mrs. Yates who properly appear pursuant to 33 U.S.C. § 921(c), that court's jurisdiction is not extended by the inclusion of *an additional party whose presence is also consistent with Article III*." *Ingalls Shipbuilding*, 519 U.S. at 266 (emphasis added).

As part of the basis for its holding in *Ingalls Shipbuilding* that the Director's "presence" in the case as a respondent does not violate Article III, the Court reiterated that "[a]s we stated in *Newport News*, although the Director had no statutory authorization to petition the Court of Appeals [to challenge a decision of an agency benefits review board], 'Congress could have conferred standing upon the Director without infringing Article III of the Constitution.'" 519 U.S. at 264 (emphasis removed) (quoting *Newport News*, 514 U.S. at 133). Thus, while an agency or Executive official "acting in [their] governmental capacity" will not ordinarily be considered a party aggrieved with an injury sufficient to establish Article III standing, the Court explained that Congress can nonetheless expressly confer such standing without "[a]ny impediment . . . of [a] constitutional origin." *Id*. at 263–64 (quoting *Newport News*, 514 U.S. at 130). Because this reasoning from *Newport News* undergirds the Article III holding in *Ingalls Shipbuilding*, it is binding upon us. *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."); *United States v. Duvall*, 740 F.3d 604, 609 (D.C. Cir. 2013) (Kavanaugh, J., concurring in the denial of rehearing *en banc*) ("[O]nce a rule, test, standard, or interpretation has been adopted by the Supreme Court, that

same rule, test, standard, or interpretation must be used by lower courts in later cases.")

Like its decision in *Postmaster General v. Early*, the Court in *Ingalls Shipbuilding* acknowledged Congress's power to define the "cases and controversies" subject to Article III jurisdiction by specifying which Executive officers or agencies may appear as parties. Accordingly, we are duty-bound to follow the statements and reasoning in *Newport News* and *Ingalls Shipbuilding*.

The statements in *Newport News* relating to a petition brought pursuant to the Occupational Safety and Health Act ("OSH Act") are particularly apt, since "the Mine Act's review process was written to conform to the review process of the OSH Act." *Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 873 (D.C. Cir. 2002); *see also Twentymile Coal Co.*, 456 F.3d at 161 & n.12 (citing cases describing the similarities between the Mine Act and the OSH Act). Hence, the *Newport News* citation to 29 U.S.C. § 660(b) in the OSH Act as an example of an instance when Congress has appropriately conferred standing on the Secretary of Labor to challenge an adjudicatory commission provides strong support in favor of justiciability here. That is so because the language of Section 660(b) and of 30 U.S.C. § 816(b), the Mine Act's judicial review provision, is identical in all material respects. That is more than sufficient to settle the issue.[6]

---

[6] Using similar reasoning, our Court held long ago that the Department of Justice, on behalf of the United States, had standing to challenge an order of the Federal Maritime Commission, and that such a dispute was justiciable. *See United States v. Fed. Mar. Comm'n*, 694 F.2d 793, 794–95 (D.C. Cir. 1982) (en banc) (per curiam) (reinstating the standing and justiciability sections of the

Despite the observations of our dissenting colleague about tenure protections of agency commissioners, *see* Dissenting Op. 22–24, none of this is contingent upon the soundness of the holding of *Humphrey's Executor*. *See Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935). The reasoning of the early Congresses, *Postmaster General v. Early*, *Newport News*, and *Ingalls Shipbuilding* had nothing to do with whether either Executive official involved in an intra-Executive lawsuit had tenure protection or other indicia of "independence" from the President. Instead, the reasoning was based on the text and original understanding of Article II and Article III.

The dissent and KC Transport invite us to reject the understanding of several early Congresses and express Supreme Court guidance. We decline.

**3.**

But that is not all. Even if we are incorrect in holding that the Commission's presence in this case as a nominal respondent is insufficient to establish an Article III justiciability challenge, and even if we are incorrect in holding that any such justiciability challenge fails, we hold that it would be appropriate to obviate the constitutional issue by removing the Commission as a respondent in this appeal. We therefore strike the Commission as a respondent to the petition.

We followed this course of action in the analogous case of *Oil, Chemical & Atomic Workers International Union v.*

---

panel opinion); *see also id.* at 810 (reproduction of panel opinion) ("Assuming arguendo that the real parties in interest are the Department [of Justice] and the Commission, as intervenors contend, we hold that *United States v. Nixon,* 418 U.S. 683 (1974) disposes of this issue in favor of the Department." (citation modified)).

*Occupational Safety & Health Review Commission* ("*OCAW*"), 671 F.2d 643 (D.C. Cir. 1982). In *OCAW,* the labor union, pursuant to the OSH Act, 29 U.S.C. § 660(a), petitioned this Court to review a decision of the Occupational Safety and Health Review Commission ("OSHRC"). The labor union named OSHRC a respondent pursuant to Rule 15(a), but we held that OSHRC is an adjudicatory agency and could not participate in judicial proceedings before this Court. *Id.* at 652. We thus granted the union's motion to amend the petition and struck OSHRC from the caption, leaving the regulated entity (the employer) as "the proper respondent." *Id*. at 653. We noted that OSHRC, like the Commission here, is an adjudicator that "settle[s] disputes between" private parties "and the Secretary of Labor over citations issued by the Secretary's inspectors"; and that it "has no enforcement power," "no duty or interest in defending its decision on appeal," and "no stake in the outcome of the litigation." *Id*. at 652. That reasoning applies equally in this case, and therefore we strike the Commission from the caption, leaving the Secretary of Labor and KC Transport as the adverse parties to the appeal. *See id.*; *see also Hinson v. NTSB*, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995) (extending *OCAW* to the National Transportation Safety Board and removing the Board as a respondent because "the Board's role is purely adjudicatory, and there is sufficient adversity between the real parties in interest to ensure proper litigation of all the issues"). Though no party here moved to strike the Commission from the caption, we have *sua sponte* reformed a caption before. *See Brown v. NHTSA*, 673 F.2d 544, 544 n.* (D.C. Cir. 1982) (*per curiam*). Furthermore, as we noted above, striking the Commission as a respondent has no real practical effect, because the Commission has not participated substantively in this action.

Our dissenting colleague argues that the relevant statute requires the Secretary to name the Commission as a respondent. Dissenting Op. 10. However, no such explicit mandate appears in the text. The statute provides: "The Secretary may also obtain review or enforcement of any final order of the Commission by filing a petition for such relief in the United States court of appeals for the circuit in which the alleged violation occurred or in the Court of Appeals for the District of Columbia Circuit, and the *provisions of subsection (a) shall govern such proceedings to the extent applicable.*" 30 U.S.C. § 816(b) (emphasis added). The provision does not specify who, if anyone, *must* be named as a respondent when the Secretary files a petition for review. Congress knows how to be specific. For instance, the Hobbs Act, the most broadly applicable agency review statute, provides that in petitions to review filed in a court of appeals, "[t]he action shall be against the United States." 28 U.S.C. § 2344. In the Administrative Procedure Act, Congress specified that "[i]f no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer." 5 U.S.C. § 703; *see also* 5 U.S.C. § 7703(a)(2) (regarding judicial review of Merit Systems Protection Board in the courts of appeals, "[t]he Board shall be named respondent in any proceeding brought pursuant to this subsection"). No such explicit language about who must be named as a respondent appears in 30 U.S.C. § 816(b), the judicial review provision relied upon by the Secretary in this case.

The best that the dissent can do is point to subsection (a) of the statute, which pertains to petitions filed by a "person," other than the Secretary, who is "adversely affected or aggrieved" by an order of the Commission. Dissenting Op. 10, n.38. Subsection (a) contains language implying that the

Commission is a party to a proceeding pursuant to such a petition for review filed in a court of appeals. *See* 30 U.S.C. 816(a) ("A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission and to the other parties . . . ."). Even if this language is best interpreted to mean that the Commission can be considered a party to such a judicial review proceeding, nothing in the text says that the Commission *must be named as a respondent in every single instance*, unlike the Hobbs Act and the other statutes noted above.

Further, and even more to the point, subsection (a) is only applicable to petitions for review filed by the Secretary "to the extent applicable." 30 U.S.C. § 816(b). Thus, even if the best reading of subsection (a) were that the Commission must be named as a respondent when a party other than the Secretary files a petition, the exception in subsection (b), combined with the doctrine of constitutional avoidance, compels us to construe subsection (b) to hold that any requirement to name the Commission as a respondent in subsection (a) is "not applicable" when the Secretary is the petitioner. Just as the Court in *Postmaster General v. Early*, we do not believe that Congress intended to defeat federal court jurisdiction when it created a system of review *in the federal courts*, and we find it appropriate to construe the statute to prevent that anomalous result. *See* 25 U.S. at 146. *See also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 577 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the

intent of Congress.").[7] In addition, to the extent that Rule 15 requires the Commission to be named as a respondent when the Secretary files a petition, *see* Fed. R. App. P. 15(a)(2)(B), we can, on our "own . . . motion, . . . suspend any provision of these rules in a particular case and order proceedings as [we] direct[]" for "good cause." Fed. R. App. P. 2(a); *see also Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 314 (1988) ("More broadly, Rule 2 gives courts of appeals the power, for 'good cause shown,' to 'suspend the requirements or provisions of any of these rules in a particular case on application of a party or on its own motion.'"); *United States v. Mitchell*, 216 F.3d 1126, 1130 (D.C. Cir. 2000) ("Insofar as the failure of the appellant to make application to the district court creates any obstacle, we note that under Federal Rule of Appellate Procedure 2, we have the authority to 'suspend any provision of' the Rules of Appellate Procedure, including Rule 22(b)(1) except in limited instances not here relevant. We therefore exercise that authority and proceed."). We find good cause to suspend any requirement in Rule 15 to name the Commission as a respondent here, to the extent any such naming creates a justiciability issue. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842 (1999) (adopting a limiting construction of Federal Rule of Civil Procedure 23 to "avoid[] serious constitutional concerns"); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 510 (1989) (construing Federal Rule

---

[7] The same result would obtain if we found that subsection (a) clearly required the Secretary to name the Commission as a respondent and that such a result violated the Constitution, because we would employ the Act's severability clause to strike the language in subsection (b) that makes subsection (a) applicable to petitions filed by the Secretary. *See* 30 U.S.C. § 801 historical note (describing the severability provision of the Federal Coal Mine Health and Safety Act of 1969, which was untouched by the 1977 amendments and is still in effect).

of Evidence 609 to avoid due process concerns, "[n]o matter how plain the text of the Rule may be"); *see also* 28 U.S.C. § 2072(b) (providing that the federal rules of procedure "shall not abridge, enlarge or modify any substantive right").

Lastly, this Court has held that the Secretary's interpretation of the Mine Act takes precedence over any interpretation by the Commission. *See, e.g.*, *Sec'y of Lab. v. Excel Mining, LLC*, 334 F.3d 1, 6 (D.C. Cir. 2003) (citing *Sec'y of Labor, ex rel. Bushnell v. Cannelton Indus., Inc.*, 867 F.2d 1432, 1435 (D.C. Cir. 1989); *RAG Cumberland Res. LP v. Fed. Mine Safety & Health Rev. Comm'n*, 272 F.3d 590, 596 (D.C. Cir. 2001); *Sec'y of Lab. v. Fed. Mine Safety & Health Rev. Comm'n*, 111 F.3d 913, 920 (D.C. Cir. 1997)). The Mine Act itself demonstrates that Congress intended that the Secretary should have the power to challenge the Commission's interpretations. *See* 30 U.S.C. § 816(b). Therefore, it makes no sense to construe the Mine Act to require that the Commission be named as a respondent if the result of such a construction is to prevent the Secretary from obtaining judicial review of the Commission's interpretation of the Mine Act. Otherwise, there would be no way to adhere to Congress's intent and our precedent that the Secretary's interpretation should have preference, because the Secretary could never bring such a challenge. Even if we are no longer compelled to give deference to the Secretary's interpretation, *see Loper Bright*, 603 U.S. at 411–12, we decline to construe the Mine Act in a way that altogether prevents the Secretary from advancing its position in court, particularly where the Secretary's position should have preference over the Commission's position.

**B.**

As to the merits, we review the Commission's legal conclusions *de novo*. *See Peabody Midwest Mining, LLC v. Sec'y of Lab.*, 70 F.4th 602, 607 (D.C. Cir. 2023). We begin with the statute's text, affording the words their "ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). But we do not interpret statutes "in a vacuum." *Torres v. Lynch*, 578 U.S. 452, 459 (2016) (quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014)). Instead, we zoom out and consider the text "in the context of the entire statute." *Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024). Finally, we may consider the text in light of its statutory and legislative history. *Id.*; *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014). Employing this comprehensive perspective and applying "all the textual and structural clues" pertinent to the task, *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 283 (2018), we seek to ascertain the text's "best meaning," *Loper Bright*, 603 U.S. at 400.

Recall that § 802(h)(1) defines a "mine" as: (1) an extraction site, under subsection (A); (2) any "private ways and roads appurtenant to" that extraction site, under subsection (B); and (3) the places, "facilities," and items "used in," "to be used in," or "resulting from" the work of extraction, milling, or preparation of minerals, under subsection (C). This case concerns the jurisdictional reach of subsection (C).

The bulk of the parties' arguments turn on how much, if at all, location matters. The Secretary argues that subsection (C)'s reach depends primarily on function—*i.e.*, whether the place or thing is "used in, or to be used in, or resulting from" mining activities is all that matters, and there is thus no

locational limit whatsoever. KC Transport and the dissent argue that the Secretary has jurisdiction over a subsection (C) facility only when it is "located at an extraction site, processing plant, or an appurtenant road at the time the violation occurs." Resps. Second Suppl. Br. 23–24; *see* Dissenting Op. 33–40. We conclude that the dissent and KC Transport's proposed construction is not the best reading of subsection (C). Rather, the Secretary's proposed construction is more aligned with the text, though we need not reach the question of whether subsection (C) has no locational limit whatsoever.

**1.**

We begin with the statutory text of subsections (A) through (C), which state that the following are considered a "mine":

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, *facilities*, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, *used in, or to be used in, or resulting from, the work of extracting such minerals* from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1) (emphases added).

This case concerns whether KC Transport's "facilit[y]" was "used in, or to be used in, or resulting from" mining activities. The statute does not define this phrase, so we typically adopt "its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Though the word "use" is "variously defined," it is "most sensibly read to mean active employment . . . and not merely a passive, passing or past connection." *Jones v. United States*, 529 U.S. 848, 855 (2000) (citation modified); *Use (v.)*, Black's Law Dictionary (4th rev. ed. 1968) ("To make use of, to convert to one's service, to avail one's self of, to employ.").

**2.**

Read in isolation, then, subsection (C) might reach "facilities" actively employed in the process of extracting, milling, or preparing minerals. But accounting for "*to be* used in" and "resulting from," 30 U.S.C. § 802(h)(1)(C), the ordinary meaning stretches to potentially gargantuan lengths that could lead to absurd results. For instance, according to the Secretary, a subsection (C) item that has not been used for mining for the past thirty years but is "to be used" for mining five years from now would be a mine. That limitless reach is belied by the "context" of subsection (C)'s "overall statutory scheme," *see Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)), which focuses on protecting persons presently engaged in mining activities, *see* 30 U.S.C. § 801.[8] The dissent agrees that the Secretary's

---

[8] We have no need to resolve the outer bounds of "used in, or to be used in, or resulting from" in this case, because there is no dispute

position that there is only a functional limit is untenable, and for the dissent, this alone is enough to import an overly narrow geographical limit into subsection (C). *See* Dissenting Op. section III.A. But such a narrow locational restriction is also belied by the context of subsection (C)'s overall statutory scheme, as we describe below.

**3.**

"Construing statutory language is not merely an exercise in ascertaining the outer limits of a word's definitional possibilities"; it demands we seek to distill the meaning that "produces a substantive effect that is compatible with the rest of the law." *Sackett v. EPA*, 598 U.S. 651, 676 (2023) (citation modified); *see also Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) ("Statutory language cannot be construed in a vacuum." (citation modified)). With that in mind, we consider whether the plain meaning of a subsection (C) "mine" comports with § 802(h)(1) as a whole.

Looking at all three subsections, KC Transport urges us to follow the Sixth Circuit in discerning from subsections (A) and (B) a locational limit that requires any subsection (C) item to be "adjacent to []or part of a working mine." Resps. Second Suppl. Br. 7 (quoting *Maxxim Rebuild Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 848 F.3d 737, 739 (6th Cir. 2017)). To KC Transport, a "working mine" includes only the area of extraction, any roads appurtenant to that land, and any preparation site. We disagree. The text of subsection (C) imposes no strict adjacency or "on location" restriction. For its

that the trucks and repair facility at issue were actively used to support extraction at the time of the inspection.

part, the dissent marshals a series of canons of interpretation, *i.e.*, the *noscitur* canon, the whole act rule, the rule against surplusage, and the absurdity canon, *see* Dissenting Op. 35–40, to create a veneer of textualism, yet in reality a locational limit simply does not exist in the text of subsection (C).

It cannot be the case that a subsection (C) facility is a mine only when it is located on or adjacent to an extraction site because such a reading would fail to give independent effect to subsection (C). Consider one type of place that appears in both subsections (A) and (C): "land." 30 U.S.C. § 802(h)(1). Reading subsection (C) "lands" to be mines only when such lands are located on or adjacent to an extraction site duplicates the coverage of subsection (A), which defines a "mine" as "an area of land from which minerals are extracted . . . ." *Id*. Such redundancy violates the rule against surplusage. *See Williams v. Taylor*, 529 U.S. 362, 364 (2000) ("[It is a] cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) ("If possible, every word and every provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").[9] The dissent argues that "an item in subparagraph (C) must be at an extraction site or processing plant." Dissenting Op. 43. However, the dissent's construction does not persuasively explain why subsection (C) applies to items *only* when located at an

---

[9] We suppose that defining "mine" to include "facilities" that are "adjacent" to an extraction site eliminates some surplusage, but the word "adjacent" appears nowhere in the text of statute.

extraction site or processing plant, when Congress included within that subsection "lands . . . or other property . . . *used in, or to be used in, or resulting from*, the work of extracting such minerals . . . [or] the milling of such minerals, or the work of preparing coal or other minerals."  30 U.S.C. § 802(h)(1)(C) (emphasis added).  Land and property can "be used in" extraction or "result from" extraction even when that land or property is not located at an extraction site, a milling site, or a processing plant.

Application of the rule against surplusage gives clear meaning to the "lands" covered in subsection (C):  Those lands that are "used in, . . . to be used in, or resulting from" mining activity are mines, even if they are not located on the "area of land" where extraction or preparation occurs, or on roads appurtenant to such land.  If that is true for "lands" defined by subsection (C), it must also be true for the "facilities" defined by subsection (C).  *See S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 378 (2006) ("A word is known by the company it keeps . . . ." (citation modified)); *Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").  We thus understand the text to permit MSHA to exercise jurisdiction over facilities even when those facilities are not located on an area of extraction, any roads appurtenant to that land, or a preparation site.

**4.**

Legislative history further confirms[10] that subsection (C) covers more than facilities "adjacent to []or part of a working mine." Resps. Second Suppl. Br. 7 (quoting *Maxxim*, 848 F.3d at 739). Congress enacted the Mine Act's predecessor, the Federal Coal Mine Health and Safety Act of 1969 ("Coal Act"), with the purpose of "improv[ing] mandatory health or safety standards to protect the health and safety of the Nation's coal miners." Pub. L. No. 91-173, § 2(g), 83 Stat. 742, 743. As our nation's use of mines accelerated, so too did the occurrence of mining-related incidents. For example, 226 miners tragically died from unexpected mine explosions in West Virginia, Ohio, and Pennsylvania in 1940 alone. J. Davitt McAteer, *The Federal Mine Safety and Health Act of 1977: Preserving a Law that Works*, 98 W. Va. L. Rev. 1105, 1113 (1996). Additional incidents also took the lives of 119 miners in Illinois in 1951; 78 miners in West Virginia in 1968; 91 miners in Idaho in 1972; and 26 miners in Kentucky in 1976. *Id.*

Because several forms of mine-related property were not enumerated in the Coal Act's mine definition, incidents like the collapse of a retention dam left confusion as to whether the Coal Act's protections applied. This uncertainty put the Act's jurisdictional bounds in question, prompting congressional action. Indeed, upon enacting the more comprehensive 1977 Mine Act, Congress cited the 1972 collapse of the Buffalo Creek, West Virginia retention dams—"result[ing] in a large

---

[10] Though "legislative history is not the law," it can be helpful in confirming or reinforcing what the text shows. *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (citation modified); *Delaware v. Pennsylvania*, 598 U.S. 115, 138–39 (2023) (recognizing "that clear evidence of congressional intent may illuminate ambiguous text" (quoting *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011))).

number of deaths, and untold hardship to downstream residents"—as a reason to amend the "mine" definition. S. Rep. No. 95-181, at 14 (1977) ("[T]he Committee [was] greatly concerned that at th[e] time [of the 1972 dam incident], the scope of the authority of the Bureau of Mines to regulate such structures under the Coal Act was questioned.").

The Coal Act's jurisdiction turned on location alone, and Congress intended to change that with the Mine Act. The Coal Act applied to "an area of land *and* all structures, facilities, . . . and other property . . . placed upon, under, or above the surface of *such land*." 30 U.S.C. § 802(h)(2) (1976) (emphases added); *see also* J.A. 161–62 ("[T]he coverage reached and applied only to personal or real property related to extracting coal *in that land*." (emphasis in original)). In order to clarify its intention to more broadly protect miners, Congress replaced the location requirement in the Coal Act—where property is placed—with a function requirement in the Mine Act—how property is used. The Coal Act did not specifically extend to "lands, excavations, shafts, slopes, and other property, including impoundments, retention dams, and tailings ponds." S. Rep. No. 95-181, at 14. So, in the Mine Act, Congress added subsection (C) to reach those items and "express [its] intention that . . . [subsection (C) items] be included in the definition of mine and subject to regulation under the Act." *Id.*

By reaching outside the location-limited boundaries in the Coal Act, the Mine Act's boundaries are less predictable than the Coal Act's. But where doubts concerning the Secretary's jurisdiction arose, Congress expressed an "intention that what is considered to be a mine and to be regulated under this Act be given the broadest possibl[e] interpretation," and "that doubts be resolved in favor of inclusion of a facility within the

coverage of the Act." *Id.* The Committee was "greatly concerned" that the authority to regulate the dams at Buffalo Creek, West Virginia was questioned prior to the 1972 collapse of the three dams, and the Committee made clear that such dams should be within the Mine Act's jurisdiction. *Id.* Notably, the closest of the three failed Buffalo Creek dams was over 0.6 miles from the coal preparation plant which fed them with wastewater. *See* Staff of S. Subcomm. on Lab. of the Comm. on Lab. & Pub. Welfare, 92d Cong., Buffalo Creek (W. Va.) Disaster, 1972 at 50 (Comm. Print 1972).

This history further supports our conclusion that subsection (C) was necessary—at least in part—to ensure the Mine Act's jurisdiction extended to places that may not be located at (or even adjacent to) an extraction, milling, or processing site, even though they are necessarily connected with the use and operation of a mine. Limiting jurisdiction in the manner the Commission did would exclude the very facilities, such as the Buffalo Creek retention dams, that Congress expressly intended to cover.

The dissent gives lip service to this legislative history, agreeing that retention dams and tailings ponds fall within the definition of a mine under the Mine Act. *See* Dissenting Op. 37–38 & n.147. But our dissenting colleague nonetheless remains steadfast that nothing, including a retention dam or a tailings pond, can be a "mine" unless it is located "at" an extraction site or a processing plant. *Id*. at 33–40. That is so, even though there is no textual basis in the Mine Act to treat retention dams and tailings ponds any differently than the "facilities," "tools," "lands" or other items listed in subsection (C), and the dissent concedes that retention dams and tailings ponds are covered by the Mine Act, even when located miles

away.[11] The dissent therefore tries to reconcile its narrow, location-specific construction of the Act with the fact that retention dams and tailings ponds are usually miles away from extraction or processing sites. To do so, the dissent rationalizes that retention dams and tailings ponds are mines within the meaning of subsection (C) because they can be construed as part of a "unified mineral processing operation." Dissenting Op. 38, n.147 (quoting *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1551 (D.C. Cir. 1984)).

The dissent's reliance on *Carolina Stalite* to salvage its strained interpretation gives away the game. In that case, we relied on the facility's "physical proximity and operational integration" with the extraction site to find that the facility was part of a "unified mineral processing operation" and thus a mine within the meaning of subsection (C). *See Carolina Stalite*, 734 F.2d at 1551. The *Carolina Stalite* "physical proximity and operational integration" test looks a lot more like

---

[11] Retention dams and tailings ponds are often located several miles away from the nearest processing plant. *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 267 (2009) (proposed tailings pond was "located some three miles from the mine"); *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1268–69 (10th Cir. 2017) (mine tailings transported to tailings ponds nine miles away from the open-pit mine); *Molycorp, Inc., Site In New Mexico Proposed To Federal Superfund List*, 2000 WL 34430085 (tailings pond was six miles west of the mine); Michael R. Lee v. Genesis, Inc., 32 FMSHRC 1392, 1394, 2010 WL 4037727, at *2 (distance from mill to tailings pond was "several miles"); Sec'y of Labor, Mine Safety and Health Administration v. Fred Chismar, 22 FMSHRC 81, 82, 2000 WL 235729, at *1 (tailings pond was "about two and a half miles outside the main gate of the mine"). .

our construction of the statute: a facility is a mine when it is "necessarily connected with the use and operation of extracting, milling, or processing coal," *see infra* Section III, than the dissent's interpretation: a facility is a mine only when it is "at" an extraction, milling or processing site, *see* Dissenting Op. 36–37.

## III.

Construing 30 U.S.C. § 802(h)(1) as a whole, we conclude that the best reading of the statute based on its text, structure, context, and history defines a "facility" as a "mine" under subsection (C) when it is necessarily connected with the use and operation of extracting, milling, or processing coal and other minerals. KC Transport and the dissent offer a parade of horribles about trucks located hundreds of miles from an extraction site or equipment that has not been used for mining in years, but we are not compelled to define the outer limit of the definition of "mine" with respect to movable objects or items used long ago to decide this case.

The parties stipulated that the trucks at issue were inspected while located at a "facility," and the parties further agreed that the trucks being inspected were used to haul coal from nearby mines to a nearby coal preparation plant. *See* J.A. 5–8. Though there may be tough calls on the margins, these and other stipulated facts make this one easy. The facility is located less than 1,000 feet from Ramaco's private haul road, about a mile from its coal processing plant, and less than five miles from its nearest extraction site. *Id*. at 6, 9. The facility was constructed there at Ramaco's permission. *Id*. at 7. Sixty percent of the services KC Transport provided at the facility were for Ramaco. *Id*. Those trucks servicing Ramaco exclusively operated on Ramaco's haul road, extraction sites,

and preparation plant. *Id*. at 10. The cited trucks were actively being used to haul coal from the Ramaco extraction site to the preparation plant. *Id*. In fact, MSHA had previously inspected the cited trucks while they were at the extraction sites and preparation plant. *Id*. Under the best reading of the statute, a facility that is this close to extraction sites and a preparation plant and used to service trucks that routinely haul coal between those locations, and which is built specifically for this purpose is a "mine." Indeed, KC Transport's facility is closer to an extraction site and a preparation plant than some retention dams and tailings ponds. *See supra* at 39–40. Such a facility, particularly when the majority of its services are for trucks used by a coal mining company, is necessarily connected with extracting and preparing coal; it is a "facilit[y] . . . used in . . . the work of extracting . . . [and] preparing coal." 30 U.S.C. § 802(h)(1)(C).

Admittedly, the statute's text does not provide a framework from which regulated parties can perfectly predict the scope of MSHA's jurisdiction with respect to all movable objects that are, have been, or could be used in mining. While that may be frustrating for KC Transport and similar businesses servicing mines, we have no need to reach all of those questions today. "Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations." *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 202 (1947). Further, it is not our job to question the prudence of Congress's statutory scheme. *Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1296 (2025). We must enforce statutes as they are written. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). So doing, we hold that KC

Transport's facility is a mine pursuant to 30 U.S.C. § 802(h)(1)(C).

\* \* \*

For the foregoing reasons, we vacate the Commission's decision and affirm the Secretary's citations.

*So ordered.*

PAN, *Circuit Judge*, concurring:

I join the majority opinion in full. I write separately to express my view that a purely adjudicatory body — like the Federal Mine Safety and Health Review Commission (the "Commission") — is not a proper party when this court reviews one of its decisions. I also note that, because the court strikes the Commission from the case caption here, the jurisdictional arguments raised by the dissent are largely academic.

I begin with what should be common ground: A court generally is not a proper party when a litigant seeks review of one of its decisions.[1] That is because "[j]udges sit as arbiters without a personal or institutional stake on either side of the [underlying] controversy." *In re Justs. of Sup. Ct. of P.R.*, 695 F.2d 17, 21 (1st Cir. 1982) (Breyer, J.). Because Article III of the Constitution limits our jurisdiction to actual cases or controversies, and adversity does not exist for a party with no interest in the outcome of the proceedings, a district court may not appear before us to defend a judgment that it has entered. *Cf. Pulliam v. Allen*, 466 U.S. 522, 538 n.18 (1984) (stating that there is "no [Article III] case or controversy between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute").

That logic extends to other purely adjudicatory entities. As the Supreme Court has explained, "[t]o require [an executive-branch] adjudicator to appear before the courts of appeals" to defend its decisions "makes little sense because that adjudicator has no more interest or stake in defending its orders in the courts of appeals than does a district court." *Ingalls*

---

[1]  Narrow exceptions exist when a party seeks extraordinary relief from a judge's allegedly unlawful actions, *see Ex parte Fahey*, 332 U.S. 258, 259–60 (1947) (writs of mandamus), or when a court fills a nonadjudicatory role, *see Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736 (1980).

2

*Shipbuilding, Inc. v. Dir., Off. of Workers' Comp. Programs, Dep't of Lab.*, 519 U.S. 248, 268 (1997). Similarly, we have held that the purely adjudicatory Occupational Safety and Health Review Commission ("OSHRC") cannot appear before us as a party because it, "like a district court, has no duty or interest in defending its decision on appeal." *Oil, Chem. & Atomic Workers Int'l Union v. OSHRC* ("*OCAW*"), 671 F.2d 643, 652 (D.C. Cir. 1982).

Like OSHRC, the Commission has a function that is exclusively adjudicatory. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) ("[The Commission was] established exclusively to adjudicate Mine Act disputes."). In the Federal Mine Safety and Health Act of 1977 (the "Act"), "Congress place[d] adjudicatory authority" in the Commission, and housed it "outside the agency charged with administering and enforcing the statute." *Ingalls*, 519 U.S. at 267. Under that statutory scheme, the Secretary of Labor, "acting through" the Mine Safety and Health Administration ("MSHA"), administers and enforces the Act; and the Secretary and MSHA appear as parties before the Commission and before courts of appeals in their enforcement capacity. *Sec'y of Lab., MSHA v. Westfall Aggregate & Materials, Inc.*, 69 F.4th 902, 906 (D.C. Cir. 2023). The Commission, meanwhile, fulfills its adjudicatory function by "settl[ing] disputes between [private parties] and the Secretary." *OCAW*, 671 F.2d at 652. The Commission, like OSHRC, "has no stake in the outcome" of petitions for review of its decisions, and, accordingly, it "may not participate in this court [upon] review [of its] decision as a party respondent in proceedings initiated by any party to [its] hearing." *Id.* Our reasoning in *OCAW* applies here and confirms that the Commission "should never be considered a proper statutory respondent under" the Act. *Id.*; *accord Jeroski v. FMSHRC*, 697 F.3d 651, 653 (7th Cir. 2012) (Posner, J.) ("The [Commission] is the equivalent of a court.").

Despite the holdings of *Ingalls*, *OCAW*, and *Jeroski*, it is not uncommon to find the Commission listed as a party in case captions, like the one at bar. Perhaps some litigants have treated the Commission as a party because they believe they must do so under 30 U.S.C. § 816 (the judicial-review provision of the Act) and Federal Rule of Appellate Procedure 15(a)(2)(B). But in my view, neither provision requires petitioners to name the Commission as a respondent.

30 U.S.C. § 816 enumerates the procedures through which parties can seek review of Commission decisions. Under § 816(a), once a party petitions a court to review a Commission order, the clerk of the court must transmit "[a] copy of such petition . . . to the Commission and to the other parties, and thereupon the Commission shall file in the court the record in the proceeding as provided in [28 U.S.C. § 2112]." My dissenting colleague reads "to the Commission and to the other parties" as implying that the Act considers "the Commission to be a party." Dissenting Op. 10. He argues that "[t]hose parties would not be '*other* parties' if the Act did not require the Commission to be a party." *Id.* (emphasis in original).

But that is not the most natural reading of § 816(a). When that provision requires the clerk to transmit a copy of the petition "to the Commission and to the other parties," the word "other" differentiates between the party that filed the petition for review, and the other parties to the case. Admittedly, that meaning would have been clearer if Congress had drafted § 816(a) differently, *e.g.*, by directing the clerk to provide copies "to the other parties and to the Commission." But the text's meaning is illuminated by the way in which § 816(a) and the cross-referenced § 2112 describe the Commission's role. Those two sections do not treat the Commission as a party, but instead assign it tasks that should fall to a neutral arbiter, such as requiring the Commission to "file in the court the record in

the proceeding," 30 U.S.C. § 816(a); enabling limited remands for the Commission to engage in further factfinding, *see id.*; and empowering the Commission to coordinate with the judicial panel on multidistrict litigation, *see* 28 U.S.C. § 2112(a)(3).

Rule 15(a)(2)(B), meanwhile, instructs that a petition for review of an agency decision "name the agency as a respondent." The dissent contends that this rule "requires the Commission to participate in this suit" as a respondent. Dissenting Op. 31. But our case law forecloses that argument. Here, we consider a "split-function regime" in which "Congress place[d] adjudicatory authority outside the agency charged with administering and enforcing the statute." *Ingalls*, 519 U.S. at 267; *see also* 30 U.S.C. §§ 811, 823. The Commission's purely adjudicatory role in a split-function statutory scheme distinguishes it from agencies in which "a single entity wears the hats of adjudicator and litigator/enforcer," and for which the application of Rule 15(a) is therefore "straightforward." *Ingalls*, 519 U.S. at 267. By contrast, we held in *OCAW* that when a party petitions for review of an adjudicator's decision in a split-function regime, "[t]he rationale of Federal Rule of Appellate Procedure 15(a) which mandates that each petition for review of an agency order shall name the agency as respondent is inapplicable." 671 F.2d at 652–53. That holding binds us, especially given the Supreme Court's express decision to withhold judgment on that very issue in *Ingalls*. *See* 519 U.S. at 267–68.[2]

---

[2] I respectfully disagree with my dissenting colleague, who asserts that *OCAW*'s logic is "in tension with recent Supreme Court precedent." Dissenting Op. 11 n.41. The cases he cites did not address the propriety of naming an exclusively adjudicatory body as a respondent: *Garland v. Ming Dai* held only that the word "appeal" in the Immigration and Nationality Act does not cover a "petition for

The erroneous inclusion of the Commission as a named party does not always require us to take corrective action. *See, e.g.*, *Otis Elevator Co. v. Sec'y of Lab.*, 921 F.2d 1285 (D.C. Cir. 1990) (Thomas, J.) (adjudicating a case in which a private petitioner named the Commission and the Secretary as respondents). When a private petitioner seeking review under § 816(a) includes the Commission as a respondent alongside the Secretary, MSHA, and/or an intervenor-respondent, an Article III case or controversy exists between that petitioner and the other listed respondents. Under such circumstances, the Commission's nominal — albeit wrongful — inclusion in the case caption does not eliminate the requisite adversity of interests. While a court may choose to strike or dismiss the Commission, *see, e.g.*, *Jeroski*, 697 F.3d at 653, it need not do so under those circumstances.

As for § 816(b) petitions — *i.e.*, petitions filed by the Secretary/MSHA — I agree with the court's holding that the Secretary and MSHA do not violate the Constitution by naming the Commission as a nominal respondent alongside a private respondent. Where no party objects to such an arrangement — and where true adversity exists between the Secretary and the private respondent — a court need not implement corrective measures. *See, e.g.*, *Westfall*, 69 F.4th 902; *Sec'y of Lab., MSHA v. Knight Hawk Coal, LLC*, 991 F.3d 1297 (D.C. Cir. 2021); *Sec'y of Lab., MSHA v. Consolidation Coal Co.*, 895 F.3d 113 (D.C. Cir. 2018); *Sec'y of Lab., MSHA v. FMSHRC*, 111 F.3d 913 (D.C. Cir. 1997); *Sec'y of Lab., MSHA ex rel.*

---

review" in a court of appeals. 593 U.S. 357, 366–67 (2021). And *United States v. Arthrex, Inc.* simply analyzed the constitutional source of executive-branch adjudicatory authority. *See* 594 U.S. 1, 17 (2021). Because neither of the cited cases discussed the issue at hand or even mentioned the scope of Rule 15(a) in this or any other context, those decisions did not undermine the holding in *OCAW*.

*Bushnell v. Cannelton Indus., Inc.*, 867 F.2d 1432 (D.C. Cir. 1989) (R.B. Ginsburg, J.).

But where, as here, a party argues that the presence of executive-branch entities on opposite sides of a case raises constitutional questions, the court can cure the captioning deficiency — and thus entirely avoid those questions — by striking or dismissing the Commission. And we can take that step either upon a party's motion, *see, e.g.*, *OCAW*, 671 F.2d at 653; *Hinson v. NTSB*, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995), or *sua sponte*, *see, e.g.*, *Brown v. NHTSA*, 673 F.2d 544, 544 n.* (D.C. Cir. 1982).[3] By striking the Commission from the case caption here, the court has eliminated the theoretical constitutional concerns addressed by the dissent.

---

[3] Rare situations may require other fixes. If, for example, a petitioner names the Commission as the sole respondent, a court must add the proper respondent (and may strike or dismiss the Commission) to maintain a case or controversy. *See OCAW*, 671 F.2d at 653.

WALKER, *Circuit Judge*, dissenting:

The Executive Branch's history is replete with internal conflict.  Think Jefferson versus Hamilton.[1]

Or Calhoun versus Eaton.[2]

Or Seward versus Chase.[3]

Or Stimson versus Morgenthau.[4]

Or Marshall versus Clifford.[5]

---

[1] Re: France; Debt; Federalism.  *See* John Ferling, *Jefferson and Hamilton: The Rivalry That Forged a Nation* 246 (2013) (France); Ron Chernow, *Alexander Hamilton* 326–31 (2004) (federal assumption of state debts); Stanley Elkins & Eric McKitrick, *The Age of Federalism* 4 (1993) (federalism).

[2] Re: Eaton's wife.  *See* John F. Marszalek, *The Petticoat Affair: Manners, Mutiny, and Sex in Andrew Jackson's White House* 66, 179 (1997) (controversy over Secretary of War John Eaton's wife led to dissolution of Andrew Jackson's cabinet).

[3] Re: Chase's ego.  *See* Shelby Foote, *The Civil War: A Narrative: Fredericksburg to Meridian* 110 (Vintage Books 1986) (1963) ("In general [Seward and Chase] were diametrically opposed. . . . Chase, who was jealous of Seward's position as the President's chief advisor, wanted not only the seat closest to the one at the head of the table, but also, as time would show, the principal seat itself.").

[4] Re: Germany.  *See* David McCullough, *Truman* 403 (1992) (debate over Morgenthau's proposal to de-industrialize Germany after World War II).

[5] Re: Israel.  *Recognition of Israel*, Harry S. Truman Library & Museum (accessed Aug. 1, 2025), https://perma.cc/SN5X-4RW3 (disagreement over whether to recognize Israel).

Or Kissinger versus Rumsfeld.[6]

Or Baker versus Meese.[7]

Or Rubin versus Reich.[8]

Or Powell versus Rumsfeld (back again).[9]

Or Biden and Gates versus Panetta.[10]

The intra–Executive Branch dispute in today's case is hardly the stuff of history. A century from now, no "Team of Rivals" tale will recount the Secretary of Labor's conflict with the Mine Safety and Health Review Commission over whether an obscure auto shop in West Virginia is somehow a "mine." But though history is unlikely to dwell on that dispute, the Constitution limits who can resolve it.

---

[6] Re: Détente. *See* Donald Rumsfeld, *Known and Unknown: A Memoir* 215–16 (2011).

[7] Re: Conservatism. *See* H. W. Brands, *Reagan: The Life* 241–43 (2015) (pragmatism versus philosophical consistency).

[8] Re: Liberalism. *See* Robert E. Rubin, *In an Uncertain World* 152–53 (2003) (disagreement over the direction of the Democratic Party after the 1994 election).

[9] Re: Iraq. *See* Rumsfeld, *supra*, at 650 (disagreement over military strategy).

[10] Re: Killing bin Laden. *See* Barack Obama, *A Promised Land* 686 (2020) ("Joe also weighed in against the raid."); Zeke J. Miller, *Biden Contradicts Earlier Account of Bin Laden Raid*, Time (Oct. 20, 2015), https://perma.cc/AGL2-YAE3 (Gates "weighed in . . . in opposition and . . . Panetta in favor"). Of course, Gates and Biden had their own disagreements. *See* Robert Gates, *Duty: Memoirs of a Secretary at War* 288 (2015) (On Biden: "I think he has been wrong on nearly every major foreign policy and national security issue over the past four decades.").

Under our Constitution, the resolution of an intra–Executive Branch dispute belongs to the one "who alone composes" the entire Executive "branch" — the President.[11] Sure, he can delegate to subordinates when he lacks the time or inclination to make a decision. But as a general matter, he cannot delegate decisions with the force of law to anyone outside the Executive Branch, especially not to an Article III court.[12]

Those courts can decide only "Cases" and "Controversies" between adverse parties. So Pepsi might sue Coca-Cola, but Pepsi cannot sue Pepsi. Likewise the Executive might sue Coca-Cola, but the Executive cannot sue the Executive.[13]

Today's suit pits the Executive Branch against itself. That is not a "Case" or "Controversy." It therefore has no place in a federal court.

## I. Background

KC Transport is not a coal company. It does not mine coal, mill coal, or process coal. Rather, KC contracts with Ramaco Resources to haul coal for Ramaco in and around Emmett, West Virginia.

---

[11] *Trump v. United States*, 603 U.S. 593, 610 (2024) (quoting *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020)).

[12] *SEC v. FLRA*, 568 F.3d 990, 997 (D.C. Cir. 2009) (Kavanaugh, J., concurring) ("legal or policy disputes between two Executive Branch agencies are typically resolved by the President or his designee — without judicial intervention").

[13] There are narrow exceptions established by precedent inapplicable here for the reasons discussed in Part II.C below.

Ramaco lets KC use a patch of land off a private road near the mines to maintain KC's trucks. KC built a parking lot on the land and installed two shipping containers and two service trucks to use as a repair shop. The shop is more than a mile away from Ramaco's coal-processing plant and about four or five miles away from Ramaco's nearest extraction site.

The trucks KC services at the shop transport more than Ramaco's coal. KC also uses the trucks for other customers that don't mine coal (or anything else). For instance, KC has a "large earth moving project" for a different company.[14]

On March 11, 2019, Inspector John M. Smith, a coal-mine inspector from the Mine Safety and Health Administration, a subagency within the Department of Labor responsible for enforcing the Federal Mine Safety and Health Act, was inspecting Ramaco's coal-processing plant. After finishing the inspection, Inspector Smith wandered more than a mile along a haulage road, down another road, across a creek, and through an open gate, until he ended up at KC's repair shop. Thereupon, Inspector Smith launched into the Mine Safety and Health Administration's first-ever inspection related to KC's facility — despite the fact that if the facility were a "mine," there should have been at least two inspections a year.[15] During that inspection, Inspector Smith concluded that KC had not taken sufficient precautions to prevent two trucks from moving during maintenance.[16] So he fined KC twice, once for each truck.

---

[14] JA 7.

[15] 30 U.S.C. § 813(a); *see also* JA 85 n.9.

[16] 30 C.F.R. § 77.404(c) ("Repairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where machinery motion is necessary to make adjustments.").

5

Rather than pay the fines, KC challenged them before the Mine Safety and Health Review Commission, a separate Executive Branch agency charged with reviewing citations issued by the Mine Safety and Health Administration. To oversimplify a bit, KC argued that its repair shop is not a "mine," and the Mine Safety and Health Administration can fine only "an operator of a coal or other mine."[17] The initial administrative law judge who heard the dispute rejected KC's challenge, concluding that the repair shop was a "mine."

On petition for discretionary review to the Commission, the Commission reversed the administrative law judge. Because KC's shop was "distant from a mine site, owned by an independent company, and used for parking and repairing its vehicles," the Commission said that KC's shop was not a "mine."[18] So the Commission concluded that the Mine Safety and Health Administration lacked jurisdiction to issue the two citations.

That decision created a conflict within the Executive Branch. The Secretary of Labor thought KC's shop was a mine. The Commission thought it was not.

At that point, one of three things should have happened:

1. The Secretary of Labor, acting through the Mine Safety and Health Administration, could have stood down and allowed the Commission to block KC's fine.
2. The Commission could have reconsidered.

---

[17] *Id.* § 814(a).

[18] JA 164.

3. Least likely of all, the President could have intervened to resolve the intra-branch conflict.[19]

Instead, the Secretary of Labor and the Mine Safety and Health Administration invited this court to resolve the intra–Executive Branch dispute.

This court (sort of) accepted that invitation. It held that the term "mine" was ambiguous, even though no party thought that it was.[20] Then, instead of determining the best reading of the Mine Act, the court remanded for the Secretary to "reconsider its position" in light of the Mine Act's ambiguity and to "adopt[ ] a reasonable interpretation of" the Mine Safety and Health Administration's jurisdiction.[21]

I dissented. I did not — and do not — believe that KC's repair shop is a "mine" as defined in the Mine Act.[22] In passing, as then-Judge Kavanaugh and Judge Rao had said in similar cases, I observed that a "'constitutional quandary is raised by a federal court resolving a lawsuit,' like this one, 'between two Executive Branch agencies.'"[23] "'Such disputes

---

[19] The nature of that intervention could have taken any number of forms, limited by any number of practical considerations. Despite those practical limitations, it is unlikely that any legal impediment would have ultimately prevented the President from resolving the conflict. *Cf. infra*, at 22–24 (explaining that the Commission's removal protections are likely unconstitutional).

[20] *Secretary of Labor v. KC Transport, Inc.*, 77 F.4th 1022, 1029 (D.C. Cir. 2023).

[21] *Id.* at 1035.

[22] *See id.* (Walker, J., dissenting); *see also infra*, Part III.

[23] *KC Transport*, 77 F.4th at 1036 n.1 (Walker, J., dissenting) (quoting *USPS v. Postal Regulatory Commission*, 963 F.3d 137, 143

do not appear to constitute a case or controversy for purposes of Article III,' because 'agencies involved in intra–Executive Branch disputes are not adverse to one another (rather, they are both subordinate parts of a single organization headed by one CEO).'"[24]  But like Judges Kavanaugh and Rao, I understood "[o]ur precedents" to "allow such suits to proceed," at least in the circumstances at hand.[25]

KC sought certiorari.  After that, the Supreme Court decided *Loper Bright Enterprises v. Raimondo*, which held that courts deciding a case or controversy may not defer to agencies "when faced with a statutory ambiguity," but must instead independently "determine the best reading of the statute."[26]  In light of *Loper Bright*, the Supreme Court granted cert, vacated this court's judgment, and remanded for us to reconsider the petition for review.[27]

We asked for supplemental briefing on the effect of *Loper Bright*.  After that, we held an oral argument, which included some questioning about the petition's justiciability.  We then requested briefing on justiciability, among other things.

---

(D.C. Cir. 2020) (Rao, J, concurring)) (cleaned up); *see also SEC*, 568 F.3d at 997 (Kavanaugh, J., concurring).

[24] *KC Transport*, 77 F.4th at 1036 n.1 (Walker, J., dissenting) (quoting *SEC*, 568 F.3d at 997 (Kavanaugh, J., concurring)) (cleaned up).

[25] *Id.*; *see also SEC*, 568 F.3d at 998; *Postal Regulatory Commission*, 963 F.3d at 144.

[26] 603 U.S. 369, 400 (2024).

[27] *KC Transport, Inc. v. Su*, 144 S. Ct. 2708 (2024).

## II. This Intra–Executive Branch Dispute Is Not Justiciable

"Before turning to the merits, we must assure ourselves of our jurisdiction."[28] Article III limits our jurisdiction to "Cases" and "Controversies."[29] That means the plaintiff or petitioner must demonstrate an "actual controvers[y] arising between adverse litigants."[30]

In today's case, one part of the Executive Branch — the head of an agency (the Secretary of Labor) and a subagency (the Mine Safety and Health Administration) — has challenged the decision of another part of the Executive Branch (the Mine Safety and Health Review Commission). That makes this an intra–Executive Branch dispute, not a conflict between adverse litigants.

We should therefore dismiss the petition for review. As a general matter, an intra–Executive Branch dispute is not a justiciable case or controversy in which the plaintiff or petitioner has standing to sue. Though I once read our precedents to preclude a dismissal on that ground, those precedents can and should be distinguished.

### A. This Is an Intra–Executive Branch Dispute

Despite the presence of an executive agency on opposing sides of this case's caption, the Secretary of Labor argues that

---

[28] *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 198 (2023).

[29] U.S. Const. art. III, § 2.

[30] *Muskrat v. United States*, 219 U.S. 346, 361 (1911).

this suit "is not properly considered an intra–Executive Branch dispute."[31]  She makes two arguments.  Neither persuades.

First, the Secretary argues that this case "is in substance a dispute between the Secretary and KC Transport," so "the nominal presence" of the Commission as a respondent "does not deprive the courts of Article III jurisdiction."[32]

But it was the Commission, not KC, that enjoyed the legal authority to stop the Secretary from citing KC.  So the Secretary's actual dispute is with the Commission, not KC.  In standing terms, the Secretary's asserted injury of being unable to enforce the Mine Act as she sees fit — the injury that a judgment "modifying" or "setting aside" the Commission's order would most naturally redress[33] — is "fairly traceable" to the Commission's decision, not to any "challenged action" taken by KC.[34]

---

[31] Secretary Second Supplemental Br. 2.

From here on, for simplicity, I will say "the Secretary" when I refer to the Secretary of Labor and the Mine Safety and Health Administration in the context of their mutual legal arguments.

[32] *Id.* at 6, 8; *cf. United States v. ICC*, 337 U.S. 426, 430 (1949) ("courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented").

[33] 30 U.S.C. § 815(a)(1) ("Upon" the "filing" of a petition for review of the Commission's order, "the court . . . shall have power to make and enter . . . a decree affirming, modifying, or setting aside . . . the order of the Commission . . . ."); *id.* § 815(b) ("The Secretary may also obtain review . . . of any final order of the Commission . . . .").

[34] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

Second, the Secretary argues that "the Commission is likely not a proper respondent in this proceeding" at all.[35] She relies on *Oil, Chemical and Atomic Workers International Union v. Occupational Safety and Health Review Commission*.[36] In that case applying the Occupational Safety and Health Act, this court held that the Occupational Safety and Health Review Commission was not a proper respondent during judicial review of its orders.[37]

*Oil Workers* dealt with a different statute and does not control this case. To be sure, the Occupational Safety and Health Act and the Mine Act are similar, but there are good reasons not to extend *Oil Workers* to the Mine Act. For one thing, the Mine Act's plain text refers to "the Commission" when describing who will participate in judicial review.[38] It instructs the relevant circuit court clerk to transmit a filed petition "to the Commission and to the other parties."[39] Those parties would not be "*other* parties" if the Act did not require the Commission to be a party.[40] For another, the Federal Rules

---

[35] Secretary Second Supplemental Br. 10.

[36] 671 F.2d 643 (D.C. Cir. 1982).

[37] *Id.* at 651–53.

[38] 30 U.S.C. § 816(a)(1).

[39] *Id.*

[40] *Id.* (emphasis added).

The Article III adversariness problem this causes does not grant us permission to re-write this statute under the guise of severability doctrine and pretend the Mine Act doesn't make the Commission a party. *But see* Maj. Op. 29 n.7. Statutory provisions often result in a lack of constitutional jurisdiction. *See, e.g.*, *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 n.† (1792). That doesn't mean we get to re-write those statutes to give ourselves jurisdiction. *See Muskrat*, 219 U.S. at 350, 360–61 (failing to use severability analysis to confer

of Appellate Procedure require petitioners to "name the agency as a respondent."[41]

---

jurisdiction upon itself when a statute created adversity problems). Instead, we dismiss. *Cf. Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."). Thus, the Supreme Court has done just that when faced with mandatory-joinder rules that lead to jurisdictional problems. *See Minnesota v. United States*, 305 U.S. 382 (1939) (dismissing for lack of jurisdiction a suit brought against several individuals because the United States was a mandatory party and possessed sovereign immunity). That is the proper course here.

[41] Fed. R. App. P. 15(a)(2)(B). To be sure, in *Oil Workers*, this court said that the "rationale" for Rule 15(a) was "inapplicable" to judicial review of Occupational Safety and Health Review Commission orders. 671 F.2d at 652–53. And upon motion of a party, it dismissed the OSHRC and struck it from the caption. *Id.* at 653; *see also Hinson v. National Transportation Safety Board*, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995) (striking a similar agency's brief upon motion by the petitioner). But *Oil Workers* doesn't govern on this point either.

We should read *Oil Workers* in light of its distinctive context. After all, the logic of *Oil Workers* is in tension with recent Supreme Court precedent. In *Oil Workers*, our court reasoned that Rule 15 was "inapplicable" because "requir[ing] the OSHRC to appear as a party would parallel requiring a district court to appear and defend its decision upon direct appeal." *Id.* at 653. But that logic has been undermined by two strands of precedent: First, the Supreme Court has now made clear that even if Rule 15 treats "collateral judicial review of executive action as 'an appeal,' . . . that does not make it an 'appeal' akin to that taken from the district court to the court of appeals." *Garland v. Ming Dai*, 593 U.S. 357, 367 (2021). That is true even when decisions of adjudicatory bodies, like the Board of Immigration Appeals in *Ming Dai* or the Commission here, are

If anyone is an unlikely respondent, it's KC. When petitioners (like the Secretary and the Mine Safety and Health Administration) seek review of an agency action (like the Commission's), the agency responsible for the reviewable action ordinarily appears as the respondent, and only after the suit is filed do affected third parties ordinarily have the opportunity to intervene.[42] Here, KC's role is analogous to a third-party intervenor, whose presence is not typically required.

In short, the Secretary's "beef in this Court" is with the Commission, not KC.[43] Therefore, this petition presents an intra–Executive Branch dispute.

---

"appeal[ed]" to a federal court. *Id.* Second, even if "[t]he activities of" the Commission "may take . . . 'judicial' forms, . . . they are exercises of — indeed, under our constitutional structure they *must be* exercises of — the 'executive Power,' for which the President is ultimately responsible." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (cleaned up). So I would not read *Oil Workers* to render Rule 15 inapplicable here. And so I would decline to exercise the majority's amorphous sua-sponte-party-dismissal-and-caption-reformation power.

[42] *See, e.g.*, *Center for Biological Diversity v. FERC*, 67 F.4th 1176 (D.C. Cir. 2023) (environmental groups as petitioners, FERC as respondent, and pipeline developer as intervenor); *Alphabet Workers Union-Communication Workers of America, Local 9009 v. NLRB*, 134 F.4th 1217 (D.C. Cir. 2025) (union as petitioner, NLRB as respondent, and employers as intervenors).

[43] KC Second Supplemental Br. 6.

## B. Intra–Executive Branch Disputes Are Traditionally Nonjusticiable

Intra–Executive Branch lawsuits violate "the long-recognized general principle that no person may sue himself."[44] Here, the Secretary of Labor, the Mine Safety and Health Administration, and the Mine Safety and Health Review Commission are "subordinate parts of a single organization headed by one CEO" — the President.[45] Put another way, because the President *is* the Executive Branch,[46] and those who serve in the Executive Branch serve only as his "alter ego[s],"[47] this dispute is in constitutional contemplation just *President v. President*. Therefore, the parties — or really the *party* — "are not adverse to one another," and their dispute over how to interpret the Mine Act does not "constitute a case or controversy for purposes of Article III."[48]

"This analysis is uncontroversial" in most contexts.[49] For example, no one expects a federal court to resolve a foreign-policy conflict between the Secretary of State and the Secretary of Treasury — if only because the Supreme Court disclaimed jurisdiction over exactly that shortly after the Founding.[50]

---

[44] *ICC*, 337 U.S. at 430.

[45] *SEC*, 568 F.3d at 997 (Kavanaugh, J., concurring).

[46] *Trump v. United States*, 603 U.S. at 610.

[47] *Myers v. United States*, 272 U.S. 52, 133 (1926).

[48] *SEC*, 568 F.3d at 997 (Kavanaugh, J., concurring).

[49] *Id.*

[50] *Cf. Sprint Communications Co., LP v. APCC Services, Inc.*, 554 U.S. 269, 274 (2008) ("history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider").

In that dispute, George Washington's cabinet disagreed about the best response to "late-eighteenth-century European hostilities that had spilled into North America."[51]  Secretary of State Thomas Jefferson thought that certain treaties obligated the United States to aid France.[52]  Conversely, Secretary of Treasury Alexander Hamilton thought that France's subsequent revolution provided grounds to suspend the treaties.[53]

Washington decided to call on the Supreme Court for assistance.  At Washington's direction, Jefferson sent a letter to Chief Justice John Jay requesting the Court's opinion on twenty-nine legal questions.[54]

In the famed *Correspondence of the Justices*, Jay declined to "extrajudicially decid[e] the questions alluded to."[55]  In a letter to Washington, Jay explained that a judicial advisory opinion would violate "[t]he lines of separation drawn by the Constitution between the three Departments of Government."[56]  He added that "the Power given by the Constitution to the President of calling on the Heads of Departments for opinions,

---

[51] William Baude, Jack Goldsmith, John F. Manning, James E. Pfander, & Amanda Tyler, *Hart & Wechsler's The Federal Courts and the Federal System* 66 (8th ed. 2025).

[52] Thomas Jefferson, *Opinion on the Treaties with France* (April 28, 1793), https://perma.cc/BPA7-6YZ6.

[53] Alexander Hamilton, *Enclosure: Answer to Question the 3d. Proposed by the President of the UStates* (May 2, 1793), https://perma.cc/M6HW-SGEK.

[54] *See Hart & Wechsler*, *supra*, at 67–68.

[55] Letter from the Justices of the Supreme Court to President George Washington (Aug. 8, 1793), https://perma.cc/D3MW-NP5X.

[56] *Id.*

seems to have been *purposely* as well as expressly limited to *executive* Departments."[57]

Since then, intra–Executive Branch disputes usually get resolved in one of three ways.

1. The President decides the question.[58]
2. The President designates someone else in the Executive Branch to decide the question, subject to the President's supervision.[59]
3. The President defers any definitive resolution of the dispute.[60]

---

[57] *Id.*

[58] Doris Kearns Goodwin, *Team of Rivals: The Political Genius of Abraham Lincoln* 335-37, 340 (2005) (Lincoln siding with cabinet officials who wanted to resupply Fort Sumter over cabinet officials who didn't want to); *cf.* Secretary Second Supplemental Br. 13 ("if the President agreed with the Commission's understanding of the Secretary's jurisdiction, he could have directed the Secretary not to pursue judicial review").

[59] Exec. Order No. 12,146, *Management of Federal Legal Resources*, 44 Fed. Reg. 42657, 42658 (July 18, 1979) ("Whenever two or more Executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is encouraged to submit the dispute to the Attorney General."); 28 U.S.C. § 512 ("The head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department."); 28 C.F.R. § 0.25(a) (The Office of Legal Counsel is responsible for "[p]reparing the formal opinions of the Attorney General" and "rendering informal opinions and legal advice to the various agencies of the Government.").

[60] David Halberstam, *The Best and the Brightest* 350 (Fawcett 1973) (1972) ("he did not want to rush too quickly, to split his Administration unnecessarily").

What the President generally cannot do is what Chief Justice Jay read Article II and Article III of the Constitution to proscribe — delegate his decisions to the federal Judiciary. That's because Article II vests *all* of the "executive Power" in the President, and Article III limits courts' jurisdiction to the "Cases" and "Controversies" of adverse parties.[61]

## C. No Exception Renders This Dispute Justiciable

Against this backdrop, courts have found intra–Executive Branch disputes justiciable only in narrow circumstances. Beginning primarily in the mid-twentieth century, courts began hearing intra–Executive Branch disputes (1) when an agency asserts an interest in its corporate, rather than sovereign, capacity, or (2) when Congress has purported to provide the agency with independence from the President. That second exception is a relic of the *Humphrey's Executor* era when the administrative state haunted American public law as a "headless Fourth Branch"[62] — an era that has not survived the Supreme Court's decisions in *Free Enterprise Fund*,[63] *Seila Law*,[64] *Collins*,[65] and *Trump v. United States*,[66] to name just a few.

---

[61] U.S. Const. art. II, § 1, cl. 1; *id.* art. III, § 2.

[62] *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 921 (1991) (Scalia, J., concurring in part and concurring in the judgment); *see also Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

[63] *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010).

[64] *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020).

[65] *Collins v. Yellen*, 594 U.S. 220 (2021).

[66] 603 U.S. at 610 ("The President" is "the only person who alone composes a branch of government.").

In today's case, the first exception does not apply because no agency is asserting an interest in its corporate capacity. And even if the second exception has survived the Supreme Court's recent cases, it does not apply here because the Secretary has forfeited any argument that any agency in this case is independent of the President. That forfeiture is understandable in light of the current administration's position that *Humphrey's Executor* was wrongly decided.[67]

### 1. Nongovernmental Interest

Precedents allow courts to adjudicate some intra–Executive Branch disputes when the plaintiff-agency asserts a nongovernmental interest — for example, if it sues in its capacity as a regulated entity[68] or as a market participant.[69] In these types of cases, the plaintiff-agency acts "as a private party would" — that is, as "a beneficiary of [a] regulatory scheme" and not as a sovereign attempting to enforce the law against private parties.[70] When acting in this "corporate

---

[67] Letter from Sarah M. Harris, Acting Solicitor General, to Richard J. Durbin, Ranking Member, Senate Committee on the Judiciary, *Re: Restrictions on the Removal of Certain Principal Officers of the United States* (Feb. 12, 2025), https://perma.cc/LE2W-4MFT.

[68] *See e.g.*, *IRS v. FLRA*, 494 U.S. 922 (1990) (IRS challenge to FLRA order requiring IRS to bargain with union); *Postal Regulatory Commission*, 963 F.3d at 138 (Postal Service challenge to regulator's order requiring "disclosure of certain financial information").

[69] *ICC*, 337 U.S. at 428 (challenge to railroad shipping rates charged to government); *United States v. FCC*, 707 F.2d 610, 612 n.2 (D.C. Cir. 1983) (challenge on behalf of several executive agencies in their "consumer interests" to AT&T's telephone rates).

[70] Michael Herz, United States v. United States*: When Can the Federal Government Sue Itself?*, 32 Wm. & Mary L. Rev. 893, 959–60 (1991); *see also Director, Office of Workers' Compensation*

capacity," agencies have been permitted to assert a nongovernmental "interest against another agency."[71]

By contrast, when an agency sues another agency in its "status . . . as [a] regulator or administrator," it asserts a sovereign interest.[72] Because "[t]here is but one federal sovereign," there can be but one sovereign interest.[73] So "[i]f both sides assert an interest as a sovereign," then they "are asserting the same interest, and there is no controversy."[74]

---

*Programs, Department of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 128 (1995) (intra–Executive Branch suits may be permissible when an agency sues in "its nongovernmental capacity — that is, in its capacity as a member of the market group that the statute was meant to protect").

[71] Joseph W. Mead, *Interagency Litigation and Article III*, 47 Ga. L. Rev. 1217, 1258 (2013).

[72] *Newport News*, 514 U.S. at 128.

[73] Mead, *supra*, at 1260.

[74] *Id.* at 1255.

The distinction between the Government's capacity as a sovereign and as a marketplace participant is recognized in other areas of the law. For example, the Foreign Sovereign Immunities Act protects foreign governments from suits related to their sovereign activities, but not related to their activities as market participants. 28 U.S.C. § 1605(a)(2) ("A foreign state shall not be immune . . . in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state . . . ."). Similarly, the antitrust state-action doctrine contemplates that states may not be immune from federal antitrust laws when acting as market participants, even though the antitrust laws generally do not cover state regulatory actions. *See City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379 (1991) ("with the possible market participant exception, *any* action that qualifies as state action is *ipso facto* exempt from the operation of the antitrust laws"

No doubt, agencies may disagree about how to exercise the United States's sovereign powers in enforcing the law against third parties. But those disputes are for the President to resolve. To involve the federal courts would be to ask them to decide "intrabranch and intraagency policy disputes — a role that would be most inappropriate."[75]

The Secretary's principal authority, *United States v. ICC*, does not help the Secretary. Instead, it provides a paradigmatic example of the nongovernmental-interest exception and shows why this case does not fit into that exception.

*ICC* involved railroad tariffs charged to the War Department during World War II.[76] After the Government took control of piers in Norfolk, Virginia, it took responsibility for transporting goods between railcars and piers.[77] But the Government alleged that the railroads continued to charge for that service even though they were no longer providing it.[78] So it filed a complaint with the Interstate Commerce Commission seeking to recover the alleged overcharges.[79] The Commission denied relief, and the Government brought an action in federal court challenging the unfavorable order.[80]

---

(cleaned up)). And finally, the Dormant Commerce Clause permits states to discriminate against out-of-state businesses when acting as market participants but not when acting as regulators. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 436–37 (1980).

[75] *Newport News*, 514 U.S. at 128–29.

[76] 337 U.S. at 428; *see also United States v. ICC*, 78 F. Supp. 580, 581 (D.D.C. 1948).

[77] *ICC*, 337 U.S. at 428.

[78] *Id.*

[79] *Id.* at 428–29.

[80] *Id.* at 429.

Although the United States was on opposing sides of the caption, the Supreme Court held that the case was justiciable because the Government had challenged the ICC order in its capacity as a market participant.[81] According to the Court, "the Government" was "not less entitled than *any other shipper* to invoke administrative and judicial protection" to determine whether it was overcharged.[82]

The Secretary reads *ICC* for the proposition that "[w]here there is an actual case or controversy between a federal agency and private party, the nominal presence of another federal agency does not deprive the courts of Article III jurisdiction."[83] But that reading is contrary to the Supreme Court's understanding of its own precedent. As that Court has explained, the key takeaway from *ICC* is that "the status of the Government as a statutory beneficiary or market participant must be sharply distinguished from the status of the Government as regulator or administrator."[84] Thus, *ICC*'s justiciability turned not on "the presence of the railroads" as private parties, but on "the presence of a nongovernmental interest on the part of the United States."[85]

This court, too, has heard intra–Executive Branch disputes involving nongovernmental interests. For example, in *United*

---

[81] *Id.* at 430; *see also Newport News*, 514 U.S. at 128 (explaining that *ICC* dealt with a suit by the Government "in its capacity as a member of the market group that the statute was meant to protect").

[82] *ICC*, 337 U.S. at 430 (emphasis added).

[83] Secretary Second Supplemental Br. 8.

Even if this understanding of *ICC* were correct, it wouldn't help the Secretary because the Commission's presence isn't "nominal" in any sense of the word. *See supra*, Part II.A.

[84] *Newport News*, 514 U.S. at 128 (discussing *ICC*, 337 U.S. 426).

[85] Herz, *supra*, at 959.

*States v. FCC*, executive agencies challenged the "rate of return" set by the FCC for AT&T's interstate and international telephone services.[86]  The Department of Justice brought the challenge on behalf of the "Department of Defense, the General Services Administration, and other federal executive agencies" to vindicate their "consumer interests."[87]  In other words, the agencies sued the FCC in their corporate capacities as telephone ratepayers, not in their sovereign capacities as enforcers of the law.

This petition is not like *ICC* or *FCC*.  The Secretary has not challenged the Commission's order as a market participant or as a regulated entity.  Instead, the Secretary is suing "as [a] regulator or administrator"[88] seeking to vindicate its sovereign interest "in [the] enforcement of the laws."[89]  So this suit does not fall under the nongovernmental-interest exception.

## 2. Presence of an "Independent Agency"

Courts have also held that intra–Executive Branch disputes involving so-called independent agencies — that is, agencies whose heads purport to enjoy removal protection — are

---

[86] 707 F.2d at 612; *see also In the Matter of American Telephone & Telegraph Co.*, 86 F.C.C.2d 257, 258 (1981).

[87] *FCC*, 707 F.2d at 612 n.2.

[88] *Newport News*, 514 U.S. at 128.

[89] Secretary Second Supplemental Br. 2.

The Secretary also asserts an interest in collecting a civil penalty from KC.  *Id.*  Although money is at stake, the Secretary here is not acting as a market participant seeking to recoup overcharges, unlike in *ICC*.  Instead, the Secretary seeks to collect the civil penalty in her sovereign capacity, and any penalty collected would "accrue to the United States" "for deposit into the Treasury."  30 U.S.C. § 820(j).

justiciable.[90] The theory goes that because independent agencies "operate with some (undefined) degree of substantive autonomy from the President in a kind of extra-constitutional Fourth Branch," they "can be sufficiently adverse to a traditional executive agency to create a justiciable case."[91]

That theory might have made sense on the logic of *Humphrey's Executor*, which upheld removal restrictions on members of the Federal Trade Commission in 1935 on the grounds that the FTC "occupie[d] no place in the executive department" at all.[92] Under that logic, there would not even be an intra-branch dispute if an independent agency is involved.

Today, *Humphrey's Executor* is a shell of itself.[93] The Supreme Court has emphasized that *Humphrey's Executor*'s "conclusion that the FTC did not exercise executive power has not withstood the test of time."[94] And the Court has interpreted

---

[90] *SEC*, 568 F.3d at 997 (Kavanaugh, J., concurring).

[91] *Id.* *United States v. FMC*, 694 F.2d 793 (D.C. Cir. 1982), is best understood as falling within this category. *See SEC*, 568 F.3d at 997 (Kavanaugh, J., concurring) (reading *FMC* that way). To be sure, the majority's opinion in *FMC* obscured more than it illuminated. Just 10 days after it was written, another panel explained that *FMC* held the dispute at issue justiciable simply because it "raise[d] issues that courts traditionally resolve and the setting assure[d] . . . concrete adverseness." *United States v. FMC*, 655 F.2d 247, 252 (D.C. Cir. 1980). That's not much of an explanation. So in making *FMC* fit with the entire body of precedent, the best reading would seem to be that the dispute ensured "sufficient adversity" for the reason the Department of Justice in that case suggested: the Commission was "an independent agency." *FMC*, 694 F.2d at 810.

[92] *Humphrey's Executor*, 295 U.S. at 627–28.

[93] *See Harris v. Bessent*, 160 F.4th 1235, 1248 (D.C. Cir. 2025) ("[V]ery little remains of *Humphrey's Executor*.").

[94] *Seila Law*, 591 U.S. at 216 n.2.

the decision as a narrow exception to the baseline rule that the President may remove executive officers at will.[95]  Under the modern Court's rule, removal restrictions are permissible only for the heads of "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions" and that does "not wield substantial executive power."[96]

---

[95] *Id*. at 216–17; *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (the President "may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents" (citing *Seila Law*, 591 U.S. at 215–18)); *see also Severino v. Biden*, 71 F.4th 1038, 1050 (D.C. Cir. 2023) (Walker, J., concurring) ("[L]ittle to nothing is left of the *Humphrey's* exception to the general rule that the President may freely remove his subordinates.").

[96] *Seila Law*, 591 U.S. at 216, 218.

The Supreme Court has also upheld restrictions on the President's power to remove "inferior officers with limited duties and no policymaking or administrative authority," *id.* at 218, such as the independent counsel in *Morrison v. Olson*, 487 U.S. 654 (1988). Unlike the FTC in *Humphrey's Executor*, the independent counsel in *Morrison* was understood to be part of the Executive Branch.  *See Morrison*, 487 U.S. at 691–92; *Seila Law*, 591 U.S. at 217–18.  But like the FTC, the independent counsel was still deemed, well, *independent*. *See Morrison*, 487 U.S. at 691–92.  That lies in tension with the Court's more recent teaching that the President "alone composes" the entire executive "branch." *Trump v. United States*, 603 U.S. at 610.  Still, while *Morrison* remains on the books, it may mean that intra–Executive Branch disputes involving independent counsel investigations cannot be properly characterized as *President v. President*.  *Cf. SEC*, 568 F.3d at 997 (Kavanaugh, J., concurring) (explaining that intra–Executive Branch disputes have been treated as permissible when "Presidents cannot (or at least do not) fully control" the Executive Branch officials).  Accordingly, they may present sufficient adversity to be justiciable.  *See United States v. Nixon*, 418 U.S. 683, 692–97 (1974).

The Secretary has not argued that the Commission satisfies that test. Nor has the Secretary argued that this petition is justiciable based on the Commission's status as an independent agency. Therefore, the Secretary "forfeited reliance on" any independent-agency exception, and we need not "consider it."[97]

In any event, I doubt that the Commission's removal protections are constitutional.[98] For one thing, the Commission may represent itself in court, even if it sometimes elects not to substantively participate in litigation. It may petition courts to enforce its subpoenas, including by holding individuals in contempt.[99] And it exists as a permanent body.[100] These are likely among the reasons that one member of the Supreme Court has already concluded that the Commission "exercis[es] substantial executive authority,"[101] which disqualifies it from the *Humphrey's Executor* exception to the President's power to remove principal officers at will.[102]

In short, the Secretary does not assert, and the Constitution, even under current Supreme Court precedent,

---

[97] *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1235 (D.C. Cir. 2025).

[98] *See* 30 U.S.C. § 823(b)(1) (commissioners removable "by the President for inefficiency, neglect of duty, or malfeasance in office").

[99] *Id.* § 823(e).

[100] *Cf. Wiener v. United States*, 357 U.S. 349, 350 (1958) ("The Commission was to wind up its affairs not later than three years after the expiration of the time for filing claims . . . .").

[101] *PHH Corp. v. CFPB*, 881 F.3d 75, 173 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting).

[102] *See Seila Law*, 591 U.S. at 218 (*Humphrey's Executor* exception applies only "for multi-member expert agencies that do not wield substantial executive power.").

likely does not allow, the Commission to exist outside of Article II in a supposed "Fourth Branch" of government.[103]  It is a subordinate Executive Branch agency.  So it is not legally adverse to other parts of the Executive Branch — just as the Chief Executive is not legally adverse to himself.

## D. The Majority's Counterarguments

The majority offers three main counterarguments.  It argues (1) intra–Executive Branch disputes are justiciable because early congresses blessed that practice; (2) my two purported exceptions are too narrow, because Supreme Court precedent establishes that adversity exists between the President and himself whenever Congress says so; and (3) this case does not need to be an intra–Executive Branch dispute at all, because Federal Rule of Appellate Procedure 2(a) lets us disregard Federal Rule of Appellate Procedure 15's requirement that the Commission be joined as respondent.  All three fail.

## 1. Early Congressional Practice

The majority starts by pointing to a few statutes from the first four congresses.  But these statutes don't mean what the majority thinks they mean.

The majority's own cases prove as much.  *Walton v. United States*, for example, was not an early intra-Executive lawsuit because it involved a suit against an apparent *former* government official.[104]  So, naturally, the suit was "against [Walton] in his individual capacity," not his official

---

[103] *SEC*, 568 F.3d at 997 (2009) (Kavanaugh, J., concurring).

[104] *See* 2 U.S. (9 Wheat.) 651, 652 (1824).

capacity.[105]  So too with *Sthreshley v. United States*, another suit brought against an individual who no longer even occupied the office.[106]

This all makes sense if one just zooms out a bit.  The whole point of the statutes the majority cites was that the United States would receive money when certain officials failed to uphold their legal responsibilities.[107]  Thus, the suits brought under these statutes must have been brought against private individuals.  If it were otherwise, judgment would have run against the office, meaning the Government would have had to pay itself — a pointless enterprise, even by government

---

[105] *Id.* at 653; *see also id.* at 651, 656.

[106] 8 U.S. (4 Cranch) 169, 171 (1807).

[107] *E.g.*, An Act to Establish the Post-Office and Post Roads Within the United States, ch. 7, § 24, 1 Stat. 232, 238–39 (1792) (providing that the Postmaster General should "cause a suit to be commenced" against "any deputy postmaster or other person," who "refuse[d] to render his accounts, and pay over to the Postmaster General, the balance by him due, at the end of every three months" and if he failed to do so, "the balances due from every such delinquent" would "be charged to, and recoverable from the Postmaster General"); *see also* Mead, *supra*, at 1236 (discussing this law); *Postmaster-General of the United States v. Early*, 25 U.S. (12 Wheat.) 136, 144–45 (1827) (discussing this law and its successors); *id.* at 145 ("The suit is brought for money due to the United States . . . ."). To the extent any of the remaining statutes authorized suits for something other than money, they authorized suits only against private individuals.  For example, the Act for the More Effectual Recovery of Debts Due from Individuals to the United States authorized "suits" to "be commenced" against either "any person" or "the executor or administrator of such person, if he be deceased." Ch. 48, § 1, 1 Stat. 441, 441 (1795).  It did not authorize suit against any office, nor provide for suit against an officer's successor-in-office after the old officer left. *Id.*

standards. Moreover, the claims alleged that the defendants had failed to uphold their duties under federal law. But "when a government official exceeded his legal authority, he did not act in his official capacity, but as a private individual."[108] Thus, he was liable to suit just as was any other individual.[109] In other words, the suits weren't intra-branch at all.

## 2. Supreme Court Precedent

Next, the majority points to three Supreme Court cases, claiming they show adversity exists so long as Congress authorizes the President to sue himself. That is wrong.

*First*, *Udall v. Federal Power Commission*.[110] The majority claims that *Udall* held an intra–Executive Branch dispute justiciable. It did not. *Udall* just recounted that an executive official, the Secretary of the Interior, had been granted by statute "special standing to appear, to intervene, to introduce evidence on [a] proposed river development program, and to participate fully in the *administrative proceedings*."[111] So, sure, the Secretary of the Interior had special "standing" to raise his concerns before the Federal Power Commission. But that tells us nothing about the adversariness requirement of Article III.

*Second*, *Newport News*. The majority notes that *Newport News* said Congress can "confer[] standing upon" agencies to

---

[108] Thomas Koenig & Christopher D. Moore, *Of State Remedies and Federal Rights*, 75 Cath. U. L. Rev. (forthcoming) (manuscript at 10), https://ssrn.com/abstract=4462807.

[109] *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 179 (1804); *see also Philadelphia Co. v. Stimson*, 223 U.S. 605, 619–20 (1912).

[110] 387 U.S. 428 (1967).

[111] *Id.* at 439–40.

sue other agencies "without infringing Article III of the Constitution."[112]  But in context, the Court was just explaining the power of an executive official to sue to vindicate "the public's interest," not the power of the Executive Branch to sue itself.[113]  Thus, the Court pointed to four precedents, none of which spoke to intra–Executive Branch suits.[114]  So *Newport News* may say something about the sorts of interests the Executive may sue over.  But it says nothing about whom the Executive may sue.

To make matters worse, this statement from *Newport News* was dictum.  That matters.  For more than 200 years, courts have recognized that dicta should "be respected," but they

---

[112] Maj. Op. 22 (quoting *Newport News*, 514 U.S. at 133).

[113] *Newport News*, 514 U.S. at 132.

[114] The first was a suit by the United States against two grantees "to cancel" some "conveyances of allotted lands" on behalf of Indian tribes. *Heckman v. United States*, 224 U.S. 413, 415–16 (1912); *see also Newport News*, 514 U.S. at 133.  The second included a singular dictum in a suit by some Indian tribes and their members against two Montana county sheriffs that the United States "would have" had "standing" to bring a "pre-emption claim on behalf of the" tribes, too. *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 474 n.13 (1976); *see also Newport News*, 514 U.S. at 133 (explaining that this statement was dictum); *Confederated Salish and Kootenai Tribes of Flathead Reservation, Montana v. Moe*, 392 F. Supp. 1297, 1300 (D.Mont. 1974).  The third was a suit by some high school students in California and their parents against the Pasadena Unified School District "and several of its officials," in which the United States intervened. *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 427 (1976).  The fourth was a suit by the Equal Employment Opportunity Commission against a telephone company, its subsidiary, and a union. *See General Telephone Co. of the Northwest v. EEOC*, 446 U.S. 318, 320–21 (1980).

"ought not to control the judgment."[115]  True, our court has at times said that "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative."[116]  But we have never said that every single word in more than 600 volumes of the U.S. Reports binds us. If so, we would be in trouble.  As Justice Jackson explained almost 300 volumes ago, "some printed judicial word" could "be found to support almost any plausible proposition."[117]  Recognizing that, we have said that "the Supreme Court 'does not decide important questions of law by cursory dicta inserted in unrelated cases.'"[118]  And we have refused to treat "expansive dicta in decisions from the Supreme Court," like the dicta in *Newport News*, as binding authority.[119]

*Third* and finally, *Ingalls Shipbuilding, Inc v. Director, Office of Workers' Compensation Programs, Department of Labor*.[120]  The majority mistakenly claims that *Ingalls* ties our hands because it quoted the dictum from *Newport News*.

In *Ingalls*, the Benefits Review Board awarded Maggie Yates, the widow of a former employee of Ingalls Shipbuilding, Inc., certain benefits under the Longshore and

---

[115] *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.); *see also* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1250 (2006).

[116] *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003).

[117] Robert H. Jackson, *Decisional Law and Stare Decisis*, 30 A.B.A. J. 334, 334 (1944).

[118] *United States v. Askew*, 529 F.3d 1119, 1148 (D.C. Cir. 2008) (en banc) (Griffith, J., concurring) (quoting *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968)).

[119] *United States v. Burwell*, 690 F.3d 500, 505 (D.C. Cir. 2012) (en banc).

[120] 519 U.S. 248 (1997).

Harbor Workers Compensation Act after her husband died.[121] Ingalls filed a petition for review in the Fifth Circuit.[122] The Director of the Office of Workers' Compensation Programs in the Department of Labor joined Yates as a respondent.[123] The case made its way to the Supreme Court, where the parties were Ingalls (private party) versus the Director (agency) and Yates (private party).[124] The Supreme Court explained that no "constitutional" "impediment" blocked "the Director's appearance as a respondent."[125] As support, it relied on the statement in *Newport News* that "Congress *could* have conferred standing upon the Director without infringing Article III of the Constitution."[126] Thus, "Article III . . . pose[d] no bar to the Director's participation as a respondent."[127]

In context, then, all these statements in *Ingalls* can stand for is the proposition that Article III adversity exists when a private party sues the Executive Branch. I agree. But I do not see what that has to do with the Executive Branch suing itself.

---

[121] *Ingalls Shipbuilding, Inc. v. Director, Office of Workers' Compensation, Department of Labor*, 65 F.3d 460, 461–62 (5th Cir. 1995).

[122] *Id.* at 462.

[123] *Id.*

[124] *See* Petition for Writ of Certiorari, *Ingalls Shipbuilding, Inc. v. Director, Office of Workers' Compensation Programs*, No. 95-1081, 1996 WL 33413828. Ingalls was joined by American Mutual Liability Insurance Co. *See id.*

[125] *Ingalls*, 519 U.S. at 264.

[126] *Id.* (quoting *Newport News*, 514 U.S. at 133).

[127] *Id.*

### 3. Rule 2(a)

Failing all that, the majority claims we need not treat this as an intra–Executive Branch dispute at all. Even though Rule 15 requires the Commission to participate in this suit, the majority argues, we should suspend that requirement under Rule 2(a). I disagree. Rule 2(a) provides that the court, "[o]n its own or a party's motion, . . . may — to expedite its decision or for other good cause — suspend any provision of these rules in a particular case and order proceedings as it directs." I would not invoke that provision here.

For starters, I see no reason to exercise our discretionary power under Rule 2 to "suspend" Rule 15. As Rule 2's text makes clear, we "*may*" suspend a provision like Rule 15, but we need not.[128] I would not exercise our discretion to suspend Rule 15 when the primary use of Rule 2(a)'s good-cause provision has long been "to relieve litigants of the consequences of default where manifest injustice would otherwise result."[129]

In comparison, the majority's use of Rule 2 is out of the ordinary. First, I doubt any manifest injustice would result to the Secretary if she were left to take up her disagreement with another agency. For centuries, such disputes have been left to the Executive Branch to settle internally. And I doubt that the

---

[128] Fed. R. App. P. 2(a) (emphasis added); *see also Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994) ("The word 'may' clearly connotes discretion.").

[129] Fed. R. App. P. 2(a) advisory committee's note to original rule (1967); *see also* Charles Alan Wright et al., *16A Federal Practice and Procedure Jurisdiction* § 3948 (5th ed.) (relieving litigants of the consequences of default has long been the primary use of Rule 2(a)).

entire history of Executive Branch (and federal court) practice reflects a never-ending series of injustices wrought against the heads of the departments. Second, there was no "default."[130] The Secretary complied with Rule 15.

Of course, just because Rule 2(a) typically serves to forgive errors like default does not mean that is all it does. Still, it makes sense to restrict Rule 2(a)'s "good cause" language to errors like default (which depend on the particular facts of particular cases) rather than read "good cause" to mean we can suspend a rule for any reason that strikes us as sensible (including apparently that the rule has consequences we don't like across a class of cases). After all, Rule 2(a) provides for suspension only "in a particular case."[131] It "does not authorize any general suspension of any rules as applied to all cases or any class of cases."[132]

That "contrast[s] with Rule 2(b)," which authorizes wholesale suspension of a rule across a class of cases.[133] But on the majority's logic, we shouldn't just suspend Rule 15's application in this case. We should suspend it across a whole class of cases dealing with the Secretary and the Commission. Rule 2(a) doesn't appear to be an appropriate vehicle for that type of suspension.

\* \* \*

To sum up, this petition presents an intra–Executive Branch dispute. As a general matter, that precludes judicial

---

[130] Fed. R. App. P. 2(a) advisory committee's note to original rule (1967).

[131] Fed. R. App. P. 2(a).

[132] Wright, *supra*, at § 3948.

[133] *Id.*; *see also* Fed. R. App. P. 2(b)(5)(A).

review. And the Secretary has not met her burden of showing that an exception applies.[134]

To be clear, I express no view as to whether the Government may be able to establish jurisdiction on occasion in different, future intra–Executive Branch disputes involving these or other agencies. But because the Secretary has not done so here, I would dismiss the petition as nonjusticiable.

### III.  KC's Auto Shop Is Not a "Mine"

This court lacks jurisdiction because the Secretary's petition presents a nonjusticiable intra–Executive Branch dispute. But even if this court had jurisdiction, I would deny the petition.

The Mine Safety and Health Administration's authority extends only to a "mine." The Mine Act generally limits a "mine" to extraction sites and processing plants. Because KC Transport's repair shop is located at neither of those places, the Mine Safety and Health Administration has no authority over the repair shop.

### A.  The Mine Act's Definition of "Mine" Has Geographic Limits

The Mine Act tasks the Secretary of Labor with setting health-and-safety standards for mines.[135] To enforce those standards, the Mine Safety and Health Administration must "make frequent inspections and investigations" of "mines."[136]

---

[134] *Cf. Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing" standing.).

[135] 30 U.S.C. § 811.

[136] *Id.* § 813(a); *see* 29 U.S.C. § 557a.

It may issue citations to mine operators that fail to meet the agency's safety standards.[137]

Because the Mine Safety and Health Administration may inspect and cite only "mines," its jurisdiction depends on the Mine Act's definition of "coal or other mines." Here, we must decide if a repair shop that sometimes fixes mining trucks is a "mine."

To count as a "mine," a facility must meet the criteria in at least one of these three subparagraphs:

(A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground,

(B) private ways and roads appurtenant to such area, and

(C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, **facilities**, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, **used in**, or to be used in, or resulting from, the work of **extracting** such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the **milling** of such minerals, **or** the work of **preparing** coal

---

[137] 30 U.S.C. § 814; *id.* § 802(d) (a mine "operator" "operates, controls, or supervises a . . . mine").

or other **minerals**, and includes custom coal preparation facilities.[138]

Though the Mine Act's definition of "mine" has no express geographic limit, the statute's "carefully calibrated scheme" confirms that one exists.[139] Two subparagraphs have express geographic limits: subparagraph (A) extends only to excavation sites, covering "area[s] of land from which minerals are extracted," and subparagraph (B) includes "roads appurtenant to such area[s]."[140]

That leaves us with subparagraph (C). It's a catch-all list of additional things that may count as mines if they are "used in" "extracting," "milling," or "preparing."[141] That list breaks down into three categories:

1. *Structures found at excavation sites*: "excavations, underground passageways, shafts, slopes, tunnels and workings."

---

[138] *Id.* § 802(h)(1) (emphases added); *see Secretary of Labor v. National Cement Co. of California, Inc.*, 573 F.3d 788, 795 (D.C. Cir. 2009) (each subprovision independently defines "mine").

[139] *Cf. Turkiye Halk Bankasi AS v. United States*, 598 U.S. 264, 273 (2023) (looking to the statutory scheme to cabin the reach of a seemingly broad statutory provision); Antonin Scalia, *A Matter of Interpretation* 24 (1997) ("the good textualist is not a literalist").

[140] 30 U.S.C. § 802(h)(1).

[141] *Id.* § 802(h)(1)(C).

2. *Structures found at processing plants*: "impoundments, retention dams, and tailings ponds."[142]

3. *Generic items*: "lands, . . . structures, facilities, equipment, machines, [and] tools."

Because words "are known by their companions," it makes sense to read the generic items in light of the two other categories in the list.[143]  Doing so suggests that lands, structures, facilities, and equipment must either be at an excavation site or at a processing plant to count as "mines" under the Act.[144]

Reading the Act that way reveals a geographic limit that neatly mirrors the Act's express functional limit.  Under the Act's functional limit, no item on the list in subparagraph (C)

---

[142] "Tailings" are a waste product generated by coal processing. They are a "residue separated in the preparation of various products (such as grain or ores)."  Tailing (def. 1), *Merriam-Webster* (2025). "[I]mpoundments, retention dams, and tailings ponds" are all structures used to store tailings.  30 U.S.C. § 802(h)(1)(C).  An "impoundment" is a generic term for a structure used to "retain tailings."  U.S. EPA, *Technical Report: Design and Evaluation of Tailings Dams* 5 (1994), https://perma.cc/68LA-UJRF.  A "retention dam" is a method of storing tailings in which the "dam[ ] [is] constructed at full height at the beginning of the disposal."  *Id.* at 6. (In other retention designs the height of the embankment is increased as tailings are added.  *See id.*)  And a tailings "pond" is a body of wastewater held in by a dam or impoundment.  *See id.* at 30.

[143] *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000).

[144] *Cf. Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1548, 1552 (D.C. Cir. 1984) (subparagraph (C) "does not require that" processing facilities "be located on property where . . . extraction occurs," so a processing facility "immediately adjacent to a quarry" was a "mine").

counts as a "mine" unless it is "used in, or to be used in, or resulting from, the work of extracting ... minerals ... or ... the milling of such minerals, or ... preparing coal or other minerals."[145] Because milling is a type of coal preparation, the Act's functional test boils down to asking whether an item on the list is used in extracting or processing coal.[146] Similarly, the Act's geographic limit asks whether an item is at an extraction site or a processing plant.[147]

---

[145] 30 U.S.C. § 802(h)(1)(C).

Milling involves grinding coal into smaller chunks so that it is commercially usable. *See* Peter T. Luckie & Leonard G. Austin, *Coal Grinding Technology*, Dep't Energy (1980), https://perma.cc/EW37-MDVA (describing how several types of coal mills operate). Coal preparation involves separating coal from the raw material extracted at a mine site. *See* 30 U.S.C. § 802(i) (defining the "work of preparing the coal" as covering the gamut of coal processing: "breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading").

[146] I focus on coal simply because of the facts of this case. I do not mean to suggest the Act is limited to coal.

[147] To the extent the Buffalo Creek incident provides relevant historical context in interpreting the Act, it doesn't defeat my analysis. Although the majority notes that the dams there appear to have been more than a half mile from the main part of the processing facility, *see* Maj. Op. 39, the dams may well be best understood as part of the larger processing facility.

After all, the tailings stored in dams are a natural product of coal processing. *See* Society for Mining, Metallurgy & Exploration, *What are Tailings* (accessed on Mar. 18, 2026), https://perma.cc/4AP6-ZENJ. And although at first coal processors would "discharge[]" tailings "into the nearest stream or river," soon "heightened environmental awareness and public pressure" led "coal operators to construct" certain structures "to contain" the tailings. *See* Stanley J. Michalek et al., *Accidental Releases of Slurry and Water from Coal*

38

Now consider the Secretary's literal reading of the statute. The Secretary contends that the Mine Safety and Health Administration's jurisdiction depends only on *function*, not *location*.[148] In the Secretary's view, any "piece of equipment" or "facility" can be a mine, no matter where it is located.[149]

The rest of the statute shows why that reading doesn't work. Many of the Act's provisions assume that a "mine" has

*Impoundments Through Abandoned Underground Coal Mines*, MSHA, Pittsburgh Safety & Health Technology Center 2 (1996). So these storage structures may be seen as an integral part of the larger processing operations.

The intimate connection between these storage structures and processing facilities may be seen in the case of Buffalo Creek. There, the tailings from the processing facility were apparently "pumped" by pipes from the facility "into" a river "above" the retention dams, such that the tailings would "flow[] into the impoundment." Senate Subcommittee on Labor of the Committee on Labor & Public Welfare, 92d Cong., *Buffalo Creek (W. Va.) Disaster, 1972*, at 12 (1972); *see also* Michalek, *supra*, at 2 (explaining that historically, tailings were "piped from the preparation plant to the impoundment"); U.S. EPA, *supra*, at 30 ("Generally, tailings slurry is transported through pipelines from the mill to the tailings impoundment for deposition."). "Other pipes" would take the "discharge of clear water from" the lower dams and "direct[]" it to "a small impoundment." Senate Subcommittee, *supra*, at 12. Then, it was "pumped back to the preparation plant for further use in the washing process." *Id.* In other words, the dams formed part of a closed-loop system that dealt with the processing of coal. So given "[t]he physical proximity and the operational integration of" the processing facility–pipe–retention dam combination, it might have been "a unified mineral processing operation." *Carolina Stalite*, 734 F.2d at 1551.

[148] Secretary Br. 16.

[149] *Id.*

a readily identifiable location. For example, a mine "operator" must "file with the Secretary" its mine's "name and address."[150] And at "each . . . mine" there must be "an office with a conspicuous sign designating it as the office of such mine."[151] Similarly, the Mine Safety and Health Administration must annually inspect each "coal or other mine[ ]."[152]

Those requirements would make no sense if a mine's location were unfixed.

Take an example. An independent contractor uses his truck for a mining job each Wednesday. The rest of the week he drives his truck 200 miles away for use at a construction site. Even when it's 200 miles away, that truck is a "mine" on a literal reading of the statute: It is a "machine[ ]" that is "used in, or to be used in, . . . the work of extracting . . . minerals."[153] Yet that result clashes with the Act's commands to install "an office with a conspicuous sign" and to file a mine's "name and address."[154]

The literal reading's problems only deepen from there. The Act covers "independent contractor[s]" when they are "performing services or construction at [a] mine."[155] And a contractor's tools and machinery are "used in, or *to be used in*"

---

[150] 30 U.S.C. § 819(d).

[151] *Id.* § 819(a).

[152] *Id.* § 813(a).

[153] *Id.* § 802(h)(1).

[154] *Id.* § 819(a), (d); *see also Maxxim Rebuild Co., LLC v. Federal Mine Safety & Health Review Commission*, 848 F.3d 737, 742 (6th Cir. 2017) (noting that "other definitions in the Mine Act portray a mine as a place").

[155] 30 U.S.C. § 802(d).

extraction wherever they are.[156]   So if the Act has no geographic limit, the agency could inspect contractors anywhere they go — including at their homes.

The Secretary insists that we can sidestep these difficulties: Because KC's trucks were located at a physical location covered by the Mine Act, we need not decide whether the trucks would be "mines" if located elsewhere.[157]

As a threshold matter, the Secretary's premise that KC's shop is covered by the Mine Act is mistaken for the reasons I just explained.  Putting that aside, the Secretary offers no geographic limiting principle for future cases where a moveable item is not on land covered by the Mine Act.  The Secretary tells us only that geography might be "relevant" in its "fact-intensive" inquiry as to whether an item is "used in" mining.[158]   So how do we know if a moveable object is a "mine"?  The Secretary's answer is, in effect, "trust us."

The better approach is to read the definition of "mine" in context, which shows that an item listed in subparagraph (C) must be located at an extraction site or a processing plant to count as a "mine" under the Act.

## B.  Processing Plants Fall Within the Geographic Limits

The Commission and the Sixth Circuit both held, as I would, that the Act has a geographic limit.  But they interpreted that limit to cover only extraction sites.  I part company with

---

[156] *Id.* § 802(h)(1)(C) (emphasis added).

[157] Secretary Supplemental Br. 21.

[158] Supplemental Oral Arg. Tr. 32, 33, 35; *see also id.* at 15, 32–35 (Counsel for the Secretary: a pickax used for mining remains a "mine" even when transported 5,000 miles from the extraction site).

them there. Textual clues suggest that the Act covers *both* extraction sites (where ore is dug out of the ground) *and* processing plants (where ore is made into a usable product).

In *Maxxim Rebuild*, the Sixth Circuit held that "facilities and equipment" count as "mines" under the Act only "if they are in or adjacent to — in essence part of" an *extraction site*.[159] The court reasoned that the list in subparagraph (C) reads as if the "author went to a mine and wrote down everything he saw in, around, under, above, and next to the mine."[160] The Commission adopted the Sixth Circuit's interpretation in its decision in this case.

But subparagraph (C)'s list reads more like the "author went to a mine [and a processing plant] and wrote down everything he saw."[161] That's because three items on the list — "impoundments, retention dams, and tailings ponds" — are associated with coal *processing*, not coal *extraction*.[162]

The rest of § 802(h)(1)(C) confirms that processing plants are included in the Act's geographic sweep. Any item in the list counts as a "mine" if it is "used in, or to be used in . . . the work of *preparing coal*."[163] And the list ends by expressly stating that a "mine" "includes custom coal preparation facilities."[164]

---

[159] 848 F.3d at 740.

[160] *Id.*

[161] *Id.*

[162] 30 U.S.C. § 802(h)(1)(C); see *supra*, note 142, 147.

[163] 30 U.S.C. § 802(h)(1)(C) (emphasis added).

[164] *Id.*

Plus, because many preparation plants are *not* located at extraction sites, the Sixth Circuit's reading would produce an odd regulatory checkerboard. Some processing plants would be covered and others not, depending on how close they are to an extraction site.[165] That outcome is hard to square with Congress's express view that "coal preparation facilities" are covered by the Act.[166]

Finally, interpreting § 802(h)(1)(C) to cover processing plants avoids surplusage. If subparagraph (C) were limited to items *at* an extraction site, it would largely collapse into subparagraph (A), which covers "area[s] of land from which minerals are extracted."[167] But reading subparagraph (C) to include processing plants gives it a distinct role in the statutory scheme.

### C. KC's Shop Is Not A "Mine"

Though I read the Mine Act's definition of "mine" differently than does the Commission, I agree with its bottom-line conclusion.[168] KC's repair shop is not a "mine" under the Act because it is not at an extraction site or processing plant. So I would deny the Secretary's petition for review.

Today's majority thankfully refuses to embrace the Secretary's geography-agnostic approach. But it also refuses

---

[165] *See Standards of Performance for Coal Preparation and Processing Plants*, 74 Fed. Reg. 51950, 51961 (Oct. 8, 2009) (coal-preparation plants may be at "mine sites" or other "industrial sites").

[166] 30 U.S.C. § 802(h)(1)(C).

[167] *Id.* § 802(h)(1)(A).

[168] *See Calcutt v. FDIC*, 598 U.S. 623, 630 (2023) (we may affirm an agency, despite disagreeing with its reasoning, if the agency "was *required* to take [the] action" at issue (cleaned up)).

to reject it. And it also unfortunately refuses to say anything at all about the contours of the functional test it seems to favor. Instead of adopting the straightforward rule that an item in subparagraph (C) must be at an extraction site or processing plant, the majority opts for an "I know it when I see it" approach to what a "mine" is.[169] Auto-body shop located decently close to a mine with trucks that transport coal to and from an extraction site pretty often? That is a mine (I think). Pair of boots bought by a guy for use in his new mining job starting six months from now at a mine 1,200 miles away? Those boots are possibly not a "mine." But really, who knows? Not the miner. Nor the owner of the boot factory. Nor the inspector. Nor the Commission. Nor the Secretary. Nor the court. So the majority offers an interpretation that leaves "regulated parties" in the "frustrating" position of not being able to "perfectly predict the scope of [the Administration's] jurisdiction."[170] And in so doing, the majority forfeits its duty under *Loper Bright* (and *Marbury*[171]) to interpret the term "mine" at all, preferring to point out those things that possess sufficient mine-ness on a case-by-case basis.

Nor is the majority's approach the only one that accords with Congress's remedial goals for the Mine Act. Mine (pun intended) does, too. To the extent Congress enacted the Mine Act to ensure the Administration would have jurisdiction over retention dams,[172] such structures are expressly covered in

---

[169] *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

[170] Maj. Op. 42.

[171] And Article III.

[172] *See* Maj. Op. 38–39 (explaining that Congress sought to eliminate jurisdictional uncertainty over retention dams following a catastrophic dam collapse in West Virginia); *see also supra*, note 147 (discussing this example).

subparagraph (C).[173]  And to the extent a facility like KC's shop falls outside the Mine Safety and Health Administration's jurisdiction, other regulators like the Occupational Safety and Health Administration may step in.[174]

*   *   *

To count as a "mine" under the Mine Act, a "facility," like KC's repair shop, must be located at an extraction site or a processing plant.  KC's repair shop is not.  So the Mine Safety and Health Administration lacks jurisdiction over it.

## IV. Conclusion

The court lacks jurisdiction to adjudicate this dispute between two parts of the Executive Branch.  So the petition should be dismissed.

If we had jurisdiction, I would deny the petition.

Because the majority disagrees, I respectfully dissent.

---

[173] 30 U.S.C. § 802(h)(1)(C).

[174] *See* Supplemental Oral Arg. Tr. 10 (Secretary's counsel explaining that the Mine Safety and Health Administration and the Occupational Safety and Health Administration coordinate the boundaries of each agency's regulatory authority through an "interagency agreement").